1  CHRISTOPHER J. BANKS (Bar No. 218779)
   HERMAN J. HOYING (Bar No. 257495)
2  ASHLEY A. KRUPSKI (Bar No. 270536)
   MORGAN, LEWIS & BOCKIUS LLP
3  One Market, Spear Street Tower
   San Francisco, California  94105-1126
4  Telephone:    415.442.1000
   Facsimile:    415.442.1001
5  cbanks@morganlewis.com
   hhoying@morganlewis.com
6
   ILONA M. TURNER (Bar No. 256219)
7  JENNIFER ORTHWEIN (Bar No. 255196)
   SHAWN THOMAS MEERKAMPER (Bar No. 296964)
8  TRANSGENDER LAW CENTER
   1629 Telegraph Ave, Suite 400
9  Oakland, CA 94612
   Telephone:    415.865.0176
10 Facsimile:    877.847.1278
   ilona@transgenderlawcenter.org
11 jen@transgenderlawcenter.org
   shawn@transgenderlawcenter.org
12
   *Attorneys for Plaintiff*
13 SHILOH QUINE (a/k/a. RODNEY JAMES QUINE)

14

15                  UNITED STATES DISTRICT COURT

16                NORTHERN DISTRICT OF CALIFORNIA

17

18 SHILOH QUINE (a/k/a. RODNEY          Case No. 14-02726-JST
   JAMES QUINE),
19                                      **FIRST AMENDED COMPLAINT**
                     Plaintiff,
20
             vs.
21
   JEFFREY BEARD; S. PAJONG; D.
22 BRIGHT; J. DUNLAP; J. LEWIS; and
   DOES 1-30,
23
                     Defendants.
24

25

26

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 25502719.5

Plaintiff Shiloh Quine (a/k/a. Rodney James Quine) ("Plaintiff") for her Complaint against Defendants Jeffrey Beard, S. Pajong, D. Bright, J. Dunlap, J. Lewis and Does 1-30, alleges as follows:

## NATURE OF THIS ACTION

1.      Plaintiff brings this civil rights action under 42 U.S.C. § 1983 to seek prospective injunctive relief based upon Defendants' failure to provide Plaintiff with medically necessary surgery in violation of the Eighth and Fourteenth Amendments to the United States Constitution and failure to provide Plaintiff access to clothing, cosmetic and hygiene items available to inmates housed in female institutions in violation of the Fourteenth Amendment to the United States Constitution.

## PARTIES

2.      Plaintiff Shiloh Quine is a citizen of California currently housed at Mule Creek State Prison in Ione, California by the California Department of Corrections and Rehabilitation ("CDCR"), and was previously housed at Salinas Valley State Prison.  Plaintiff has been incarcerated under the custody of the CDCR since 1980.  Plaintiff is a transgender woman – an individual whose gender identity is different from the male gender assigned to her at birth, who requires medical treatment to better conform her body to that gender identity.  She experiences severe dysphoria and distress resulting from the incongruence between her male physical features and her female gender identity. Plaintiff received her first feminizing hormone therapy in approximately January 2009 as a treatment for her gender dysphoria.  Plaintiff has consistently lived openly as a female since 2008 and taken feminizing hormones since 2009, yet she still suffers from extreme dysphoria and Defendants have refused to allow Plaintiff to obtain medically necessary surgery to further her treatment.

3.      Upon information and belief, Defendant Dr. Jeffrey Beard ("Beard") is a resident of California.  Since his appointment by Governor Edmond G. Brown, Jr. on December 27, 2012, Beard has served as Secretary of the CDCR.  In his position as Secretary, Beard has ultimate responsibility and authority for the operation of the CDCR, including the administration of health care and the execution of policies governing medical care.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 25502719.5

1

FIRST AMENDED COMPLAINT

4.     Upon information and belief, Defendant S. Pajong ("Pajong") is a resident of California.  Upon information and belief, at all relevant times, Pajong was an agent or employee of the CDCR with the title "Physician & Surgeon- Salinas Valley State Prison" and was charged with evaluating certain appeals of prisoner health care issues with the authority to grant or deny the relief requested in the appeals.  Upon information and belief, Pajong is currently employed by the CDCR at Salinas Valley State Prison in Soledad, California.

5.     Upon information and belief, Defendant D. Bright ("Bright") is a resident of California.  Upon information and belief, at all relevant times, Bright was an agent or employee of the CDCR with the title "Physician & Surgeon- Salinas Valley State Prison" and was charged with evaluating certain appeals of prisoner health care issues with the authority to grant or deny the relief requested in the appeals.  Upon information and belief, Bright is currently employed by the CDCR at Salinas Valley State Prison in Soledad, California.

6.     Upon information and belief, Defendant J. Dunlap ("Dunlap") is a resident of California.  Upon information and belief, at all relevant times, Dunlap was an agent or employee of the CDCR with the title "Chief Medical Executive" and was charged with evaluating certain appeals of prisoner health care issues with the authority to grant or deny the relief requested in the appeals.  Upon information and belief, Dunlap is currently employed by the CDCR at Salinas Valley State Prison in Soledad, California.

7.     Upon information and belief, Defendant J. Lewis ("Lewis") is a resident of California.  Upon information and belief, at all relevant times, Lewis was "Deputy Director-Policy and Risk Management Services" in the California Correctional Health Care Service-Office of Third Level Appeals with the authority to grant or deny the relief requested in the appeals.

8.     Does 1-30 are unnamed agents or employees of CDCR that participated in the decision to deny Plaintiff access to clothing, cosmetic and hygiene items available to inmates housed in female institutions and adequate medical care including sex reassignment surgery.

9.     Plaintiff reserves the right, consistent with applicable rules and orders, to amend this Complaint to include other officials should it become apparent that those officials' inclusion is necessary to grant the prospective injunctive relief requested herein.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 25502719.5

2

FIRST AMENDED COMPLAINT

**JURISDICTION**

10.     This court has jurisdiction over the claims pursuant to 42 U.S.C. §§ 1331 and 1343(a)(3).

11.     Venue is appropriate in this judicial district pursuant to 42 U.S.C. § 1391(b)(2), as a substantial part of the events giving rise to the claim occurred in the Northern District of California.

**FACTUAL BACKGROUND**

**I.      PLAINTIFF'S PERSONAL HISTORY WITH GENDER DYSPHORIA**

12.     Plaintiff was born Rodney James Quine on August 7, 1959 in Los Angeles, California, and grew up in northern California and Arizona.

13.     During childhood and early adolescence, Plaintiff never felt comfortable in the male gender that was assigned to her at birth.  This manifested itself in Plaintiff feeling herself to be a female as early as nine years old, playing with dolls, and preferring to socialize with girls.

14.     As a child, Plaintiff lived with her mother and father and her sister (now deceased) and two half-sisters.  Plaintiff identified closely and maintains a relationship with her mother but Plaintiff's father was an emotionally and physically abusive individual who antagonized Plaintiff when she showed signs of her female identity.

15.     At the age of around twelve, Plaintiff experienced her first "out" experience by dressing in female clothes for a school event called "weird" day.  It was at this event that Plaintiff was able to express her female gender for the first time.

16.     At the age of 18, Plaintiff was detained in county jail for approximately a month.  During her confinement, she cut her wrists in an attempted suicide in large part because she did not feel comfortable in her own skin as a result of her gender dysphoria.

17.     Plaintiff dropped out of school after the ninth grade, never received a high school diploma and was functionally illiterate at the time of her incarceration.  Plaintiff educated herself while in prison, learning to read and write at the age of 27.

18.     Plaintiff was arrested in Los Angeles on March 1, 1980 and charged with robbery,

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 25502719.5

3

FIRST AMENDED COMPLAINT

kidnapping, and murder for events that occurred on February 18, 1980. Plaintiff was convicted and received life in prison without possibility of parole.

19.     Although Plaintiff was unaware of the term "transgender" until approximately 2008, she has identified as female from a young age and lived the life of a woman in a compromised form since her childhood. Plaintiff first tried female hormones that she purchased on the black market around the age of 19. Around that time, Plaintiff unsuccessfully attempted self-castration as a result of her gender dysphoria.

20.     Since she has been under the care of CDCR, Plaintiff has attempted suicide several additional times, largely as a result of her feelings of hopelessness surrounding her gender dysphoria. It was after an attempt in 2008 that she first received a referral for transgender services from her doctors. On September 18, 2008, Dr. Lyle filed a "Physician Request for Services" noting that Plaintiff felt her psychological diagnosis was related to not acting on her transgender status, and asked that she be seen by the Transgender Clinic for an initial consultation "ASAP." Dr. Lyle also noted that Plaintiff "has wanted to be transgender/female since 8 yrs old."

21.     On August 23, 2008, Plaintiff made a formal request for gender-related hormone therapy treatment, stating that she had always "felt this [female] gender," and that at 18 years old, she had been "looking to become fully a woman," but then she was incarcerated and was unable to do so.

22.     In her August 23, 2008 letter, Plaintiff stated treatment to fully transition to female is "the only decision [she] can live with."

23.     On October 15, 2008, Plaintiff's physician again requested that she be seen by the Transgender Clinic.

24.     On or around October 28, 2008, Plaintiff had a consultation with a transgender specialist, who diagnosed her with gender identity disorder. Subsequent to Plaintiff's initial diagnosis, the American Psychiatric Association published a revised version of its Diagnostic and Statistical Manual of Mental Disorders in 2013, which replaced the "gender identity disorder" diagnosis with that of "gender dysphoria." The DSM-V characterizes the diagnosis of gender dysphoria as follows: "[i]ndividuals with gender dysphoria have a marked incongruence between

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 25502719.5

4

FIRST AMENDED COMPLAINT

the gender they have been assigned to (usually at birth, referred to as *natal gender)* and their experienced/expressed gender." Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 453 (5th ed. 2013) ("DSM-V"). In addition to this marked incongruence, "[t]here must also be evidence of distress about this incongruence." *Id.* This Complaint will generally refer to the condition as gender dysphoria even when referring to Plaintiff's diagnoses prior to 2013.

25. Upon receiving her gender dysphoria diagnosis in 2008, it was determined that it was medically necessary for Plaintiff to receive treatment for her condition that would help to bring her body into greater conformity with her gender identity. Towards achieving this goal, Plaintiff was prescribed feminizing hormone therapy starting in January 2009. Plaintiff has now been on female hormone therapy continuously for approximately six years.

26. As a result of Plaintiff's feminizing hormone therapy over the past six years, her physical features and voice have feminized and she has essentially been medically castrated. She presents herself as female, and is described in her prison records as having a "feminine appearance (long, braided hair, eye shadow)." A CDCR prison psychologist notes that she has been living "openly as a woman since 2008."

27. Plaintiff had at times been able to unofficially procure makeup to allow herself to present herself as she actually sees herself; however, when she would attempt to wear make-up (as non-transgender female inmates are allowed to do); staff members insisted that she wash her face or take a shower. As a result of these responses, Plaintiff tattooed make-up permanently on her face so that she would be able to present a more feminized face to the world and it could no longer be removed against her will.

28. Further, as part of her treatment for gender dysphoria and to militate against the effects caused by the discrepancy between Plaintiff's female gender identity and the male sex assigned to her at birth, Plaintiff changed her name from the normatively masculine Rodney James Quine, to the normatively feminine name Shiloh Quine. Plaintiff has been using the name "Shiloh" – in all settings in which she had the ability to do so – since 2008. Plaintiff has also formally submitted a request to officially change her name pursuant to CDCR requirements.

29.     Despite living openly as a female and receiving hormone therapy, however, Plaintiff has continued to suffer from severe dysphoria causing her extreme mental anguish as the end goal of Plaintiff's treatment always has been to bring her primary and secondary sex characteristics into conformity with her female gender identity.  The only way this can be accomplished for Plaintiff is through sexual reassignment surgery ("SRS"), also known as gender conformation surgery, which involves, *inter alia*, reconstructing the genitals to conform in appearance and function to that typically associated with the individual's gender identity.  As her records indicate, Plaintiff always has believed SRS would bring a sense of "internal completeness."

30.     Indeed, plaintiff has made numerous formal and informal requests for SRS since she started on hormones in 2009, but her cries for relief though surgery have repeatedly gone unanswered.

31.     In 2009, Plaintiff filed a Patient/Inmate Health Care Appeal Form 602-HC seeking, *inter alia*, "sex reassignment (sex change) surgery."  The informal level review was bypassed and Plaintiff's appeal was sent directly to the second level of review.  Although the second level reviewer acknowledged that Plaintiff had specific medical needs relating to her transgender status and granted her request in part with regard to other concerns regarding her treatment, Plaintiff's request for SRS was completely ignored by CDCR at both the second and third levels of review.

32.     Plaintiff's medical records show extreme emotional distress and mental anguish relating to her failure to obtain SRS.  The records show Plaintiff attempted suicide in June 2014 after "they told me I can't get the surgery (for a sex change)."  This was a serious attempt, with cuts on her wrists "requiring some sutures."

33.     In addition to treating the severe mental anguish, including anxiety, depression and suicidal ideation Plaintiff experiences as a result of her gender dysphoria, SRS also is medically necessary so that Plaintiff may reduce the high doses of feminizing hormones she receives, which hormones Defendants repeatedly have acknowledged are a medically necessary treatment for Plaintiff's gender dysphoria.  Large intakes of female hormones over the course of many years

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 25502719.5

6

FIRST AMENDED COMPLAINT

can contribute to increased risks of heart and vascular conditions and certain cancers.  Eliminating these unnecessary risks is especially important in Plaintiff's situation as she suffers from Hepatitis C, which has caused and continues to cause damage to her liver function that would be exasperated by continuing high dosages of the hormones, particularly in the oral format to which Plaintiff currently is prescribed.  If she were to develop any of the aforementioned side-effects from the feminizing hormones, she would face significant, heightened risks due to her Hepatitis C status.

34.     On April 11, 2014, Plaintiff was seen by Dr. B. Bloch, Psy.D., for assessment as to whether SRS was medically necessary for her gender dysphoria.  Dr. Bloch unequivocally stated "[i]t is the opinion of this writer that the patient is a good candidate for sexual reassignment surgery on the basis of medical necessity, that a surgical procedure is reasonable and necessary to alleviate severe pain."

35.     In the April 11, 2014 analysis, Dr. Bloch states that "[a]n assessment of patient's requests should take into account both Title 15 and community standards."  Dr. Bloch articulates that WPATH is an appropriate community standard to look to.  Dr. Bloch then unequivocally states that Plaintiff "is a good candidate for sexual reassignment surgery on the basis of medical necessity, [and] that a surgical procedure is reasonable and necessary to alleviate severe pain."  Dr. Bloch continues, stating Plaintiff "is effectively living the life of a woman in a male prison; that [she] does this with a degree of self-confidence does not diminish the need for expressing [her] identity as [she] experiences it, or the suffering [she] may possibly face again in the future because of [her] physical and environmental situation.  Therefore this writer recommends that sexual reassignment surgery would be an appropriate and effective intervention in the treatment of this patient."

36.     Dr. Bloch also noted that access to "specific feminine products and clothing items" would "enhance the patient's ability to function comfortably in [her] environment," and that "these forms of self-expression are not in themselves a superficial matter."  Dr. Bloch did conclude, however, that compared to Plaintiff's medical need for SRS, these items were "not critical factors in the alleviation of severe pain at this time," but noted that "they would have to be

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 25502719.5

7                    FIRST AMENDED COMPLAINT

considered more closely should sexual reassignment surgery be denied."

## II.     SRS IS WIDELY RECOGNIZED AS MEDICALLY NECESSARY TREATMENT FOR GENDER DYSPHORIA

37.     Dr. Bloch's finding that SRS was a medically necessary treatment for Plaintiff's gender dysphoria is supported by leading medical research and standards of care.  Gender dysphoria is recognized as a serious medical condition, with mental and physical manifestations. SRS has widely been accepted as genuine, necessary treatment for severe cases of gender dysphoria, including by the California Medicaid program, the federal Medicare program and federal courts that have addressed the issue.

38.     Gender dysphoria is not just a mild discomfort with one's sex assigned at birth; rather, it is a profound disturbance such that the lives of some transgender people revolve only around performing activities to lessen their gender distress.  DSM-V 453-454. Gender dysphoria often comes with severe mental anguish and the inability to function normally at school, at work, or in a relationship.  *Id.* at 457-58.  Moreover, those suffering from gender dysphoria often become socially ostracized and stigmatized, which further diminishes self-esteem.  *Id.*  Although gender dysphoria on its own is not considered a life-threatening illness, when not properly treated, it is often associated with dangerous related conditions such as depression, substance related disorders, self-mutilation, and suicide.  *Id.* at 458-59.  Without treatment, the path for those suffering from gender dysphoria can be torturous, as evidenced by shockingly high suicide attempt rates:  45 percent for those aged 18-44, in comparison to the national average of 1.6 percent, according to the 2009 National Transgender Discrimination Survey.  Plaintiff's medical records reflect this troubling statistic, as she has repeatedly engaged in self harm and suicidal ideation (including creating a noose in her cell and cutting her wrists) as a response to her despair over her gender dysphoria.

39.     The World Professional Association for Transgender Health ("WPATH") is a non-profit, multidisciplinary professional association dedicated to understanding and treating gender dysphoria.  The organization seeks to promote evidence-based care, education, research, advocacy, public policy, and respect for transgender health.  WPATH publishes the Standards of

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 25502719.5

8

FIRST AMENDED COMPLAINT

1  Care for the Health of Transsexual, Transgender, and Gender Nonconforming People ("Standards

2  of Care"), which are based upon the best available science and expert professional consensus and

3  articulate clinical guidance for health professionals to assist with safe and effective care that

4  maximizes the patients' overall health and psychological well-being. The current version of the

5  Standards of Care—Version 7—was released in September 2011 following a five-year process in

6  which eighteen gender dysphoria specialists submitted peer-reviewed papers to help identify the

7  most effective treatments for gender dysphoria. Eli Coleman et al., Standards of Care for the

8  Health of Transsexual, Transgender, and Gender-Nonconforming People, Version 7, 13 INT'L J.

9  OF TRANGENDERISM, 165 (2011) ("Standards of Care"). WPATH's Standards of Care are the

10  prevailing standards for treating gender dysphoria. Mental health providers and medical

11  professionals rely heavily on the Standards of Care in determining the best course of treatment for

12  their patients.

13      40. The Standards of Care make clear that SRS is an "essential and medically

14  necessary" treatment for gender dysphoria in certain cases. Hormone therapy alone for those

15  individuals is not sufficient. As the Standards of Care explain:

16      While many transsexual, transgender, and gender-nonconforming individuals find
    comfort with their gender identity, role, and expression without surgery, for many

17      others surgery is essential and medically necessary to alleviate their gender
    dysphoria. For the latter group, relief from gender dysphoria cannot be achieved

18      without modification of their primary and/or secondary sex characteristics to
    establish greater congruence with their gender identity.

19

20      41. Under the Standards of Care, the criteria for vaginoplasty (surgical construction of

21  a vagina) in male-to-female transsexuals include "[p]ersistent, well-documented gender

22  dysphoria," "[twelve] continuous months of hormone therapy as appropriate to the patient's

23  gender goals," and "[twelve] continuous months of living in a gender role that is congruent with

24  their gender identity." *Id.* at 60. The twelve-month requirement that an SRS candidate live in an

25  identity-congruent gender role is "based on expert clinical consensus that this experience provides

26  ample opportunity for patients to experience and socially adjust in their desired gender role,

27  before undergoing irreversible surgery." *Id.* It is also recommended that patients seeking SRS

28  have regular visits with a mental health professional or other medical professional.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 25502719.5

9

FIRST AMENDED COMPLAINT

42.     The Standards of Care apply equally to inmates and non-inmates, expressly noting that "[h]ealth care for transsexual, transgender, and gender-nonconforming people living in an institutional environment should mirror that which would be available to them if they were living in a non-institutional setting within the same community. . . .  All elements of assessment and treatment as described in the SOC can be provided to people living in institutions.  Access to these medically necessary treatments should not be denied on the basis of institutionalization or housing arrangements."  *Id.* at 206-07.

43.     In California, both Medicaid and private health insurance plans are legally required to offer coverage for health care treatment related to gender transition, including SRS.

44.     Medical studies have shown the effectiveness of SRS as a treatment for gender dysphoria.  Modern SRS has been practiced for more than half a century and is the internationally recognized treatment for severe gender dysphoria in transgender persons.  A thorough analysis of available research conducted in 1990 concluded that SRS is an effective treatment for gender dysphoria because it drastically reduced the distress of patients with gender dysphoria.  In 2007 a review of multiple studies on SRS was conducted. Special attention was paid to the effects of SRS on gender dysphoria, sexuality, and regret. The researchers concluded that SRS is an effective treatment for gender dysphoria and the only treatment that has been evaluated empirically with large clinical case series.

45.     A 2009 study aimed at evaluating the results of surgical reassignment of genitalia in transgender women concluded that surgical conversion of the genitalia is a safe and important phase of the treatment of transgender women.

46.     In a study published in 2010 on outcomes of individuals following sex reassignment almost all patients were satisfied with the sex reassignment and 86% were assessed by clinicians at follow-up as stable or improved in global functioning.

47.     Another study conducted in 2010 with 247 transgender women indicated surgical treatments are associated with improved mental health-related quality of life.

48.     Nearly every study to date has concluded SRS is an effective treatment for gender dysphoria.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 25502719.5

10

FIRST AMENDED COMPLAINT

49.     Research also has confirmed that hormone therapy alone is insufficient to treat certain cases of gender dysphoria.  For example, one study compared gender dysphoria patient groups before treatment, during hormone therapy and after SRS and showed that a bigger improvement occurs after SRS than after simply changing the gender role.

## III.     DEFENDANTS DENIED PLAINTIFF ACCESS TO PERSONAL ITEMS AND MEDICALLY NECESSARY SURGERY

50.     On September 26, 2013, Plaintiff again filed a Patient/Inmate Health Care Appeal Form 602-HC seeking (among other things) SRS as a medically necessary treatment for her gender dysphoria, because the feminizing hormones Plaintiff has been treated with were unsuccessful in reducing the extreme distress Plaintiff suffers as a result of her gender dysphoria. Plaintiff specifically requested that she be allowed to complete "triadic therapy" defined by her as "hormones," a "real-life experience" and "sex-change surgery."  In addition to SRS, Plaintiff sought access to clothing, cosmetic and hygiene items pre-approved and available to inmates housed in female institutions.  All inmates have access to certain catalogs which contain items that have been pre-approved for special purchase by the inmates, depending on their security status.  Plaintiff has repeatedly been denied access to items in the catalogs pre-approved for inmates in female institutions.

51.     Plaintiff ultimately was denied access both to SRS and the requested personal items.  Remarkably, Plaintiff was denied SRS despite her clear record of severe distress, including suicidal ideation and attempts, resulting from her gender dysphoria and the explicit finding by Dr. Bloch – a CDCR psychologist – during the appeals process that SRS is medically necessary to treat Plaintiff's gender dysphoria.

52.     The first level of review of Plaintiff's appeal was performed by Defendants S. Pajong, DO, and D. Bright, DO, physicians and surgeons at Salinas Valley State Prison.  Despite Plaintiff's well-documented case of serious gender dysphoria and the resulting mental anguish, including anxiety, depression and suicidal ideation and attempts that only SRS would effectively treat, Defendants Pajong and Bright did not even address Plaintiff's request for SRS in their First Level Appeal response dated December 12, 2013.  Plaintiff's medical records make clear that

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 25502719.5

11

FIRST AMENDED COMPLAINT

Plaintiff had been living as a female and receiving feminizing hormone therapy for over four years but still experienced significant distress and anxiety as a result of the discrepancy between her remaining male sex characteristics and her female gender identity. Plaintiff's mental anguish is intensified by being forced to live every minute of every day in a body with male genitalia that does not match her biology or deeply rooted identity. It thus was clear under prevailing Standards of Care and medical research that SRS was medically necessary and that Plaintiff fully met the requirements for sex reassignment surgery. Despite this fact, Defendants Pajong and Bright entirely ignored and thereby denied her request for surgery and only addressed Plaintiff's appeal with regard to access to clothing, cosmetic and hygiene items pre-approved and available to inmates housed in female institutions. Although the response purportedly "partially granted" Plaintiff's appeal, in fact, Defendants actually only parroted a CDCR guideline that provides access to sports bras to transgender female inmates and wholly ignored and thereby denied Plaintiff's request to obtain additional clothing, cosmetic and hygiene items that are pre-approved and available to inmates housed in female institutions, such bras other than sports bras.

53.     The response makes clear that Defendants Pajong and Bright were fully aware of Plaintiff's diagnosed gender dysphoria but were deliberately indifferent to Plaintiff's medical need for SRS and completely ignored this aspect of her appeal, denying her medically necessary treatment by their silence. Defendants Pajong and Bright failed to take any reasonable measures to address the ongoing mental anguish that Plaintiff suffers as a result of her gender dysphoria, which is not fully addressed by the feminizing hormone therapy that Plaintiff has been receiving. Defendant Pajong and Bright's failure to address Plaintiff's request for medically necessary SRS was unreasonable and manifested a wanton disregard for appropriate treatment of Plaintiff's gender dysphoria based upon her history documented in her medical records and the prudent professional standards embodied by the WPATH Standards of Care. In particular, Defendants were deliberately indifferent to Plaintiff's repeated attempts for SRS and documented severe anguish, including suicidal ideation and attempts, resulting from the denial of that treatment. Defendants' deliberate indifference is further evidenced by the complete failure to even mention Plaintiff's clear request for SRS to alleviate her suffering. Defendant Pajong and Bright's failure

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 25502719.5

12

FIRST AMENDED COMPLAINT

1    to even address Plaintiff's request further evidences the CDCR's blanket policy and custom of

2    prohibiting SRS for transgender individuals, in direct disregard for universally accepted standards

3    of medically necessary treatment. The failure to address Plaintiff's request for personal items

4    approved and available to individuals in female facilities also evidences a clear policy to treat

5    transgender women inmates differently than cisgender women inmates.

6    54.    Moreover, Defendants Pajong and Bright's apparent reliance on their own, non-

7    specialized conclusion that SRS was not medically necessary also evidences their deliberate

8    indifference. Had Defendants Pajong and Bright taken Plaintiff's condition and request seriously,

9    they would have authorized the medically necessary treatment or referred Plaintiff to a specialist

10   with the requisite expertise and experience to assess Plaintiff's medical needs.

11   55.    Following Defendants Pajong and Bright's failure to address SRS in Plaintiff's

12   first level appeal, Plaintiff appealed to the second level of review on December 23, 2013, stating

13   "the decision 12-12-13 didn't even respond to my appeal. . . .There was no responce [sic] to the

14   surgery . . . ." Plaintiff also noted that the appeal did not address her request for the personal items

15   approved and available to individuals in female institutions. Plaintiff's second level appeal was

16   denied by Defendant J. Dunlap, Chief Medical Executive of Salinas Valley State Prison on or

17   around February 7, 2014.

18   56.    In the denial, Defendant Dunlap writes that "[g]ender reassignment surgery is

19   currently not considered a treatment option within the current GID guidelines." Defendant

20   Dunlap presumably refers to the CDCR's blanket restriction on the provision of SRS embodied in

21   CDCR Department Operation's Manual section 91020.26, a section captioned "Gender Dysphoria

22   Treatment," that states: "Implementation of surgical castration, vaginoplasty, or other such

23   procedures shall be deferred beyond the period of incarceration. Surgical procedure shall not be

24   the responsibility of the Department."

25   57.    Defendant Dunlap's response makes clear that Defendant Dunlap was fully aware

26   of Plaintiff's diagnosed gender dysphoria but was deliberately indifferent to Plaintiff's medical

27   need for SRS. Defendant Dunlap failed to take any reasonable measures to address the ongoing

28   mental anguish that Plaintiff suffers as a result of her gender dysphoria, which is not fully

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 25502719.5

13

FIRST AMENDED COMPLAINT

addressed by the feminizing hormone therapy that Plaintiff has been receiving. Defendant Dunlap's failure to address Plaintiff's request for medically necessary SRS other than to cite a blanket policy against the provision of SRS was unreasonable and manifested a wanton disregard for appropriate treatment of Plaintiff's gender dysphoria based upon her history documented in her medical records and the prudent professional standards embodied by the WPATH Standards of Care. In particular, Defendant was deliberately indifferent to Plaintiff's repeated attempts for SRS and documented severe anguish, including suicidal ideation and attempts, resulting from the denial of that treatment.

58.    Moreover, Defendant Dunlap's apparent reliance on Dunlap's own, non-specialized conclusion that SRS was not medically necessary also evidences his deliberate indifference. Had Defendant Dunlap taken Plaintiff's condition and request seriously, he would have authorized the medically necessary treatment or referred Plaintiff to a specialist with the requisite expertise and experience to assess Plaintiff's medical needs.

59.    Defendant Dunlap also denied Plaintiff's request to have "female clothing, cosmetics and personal hygiene" items because "these treatment modalities is not within the existing GID guidelines." The response clearly evidences a CDCR policy to treat transgender women inmates differently than cisgender women inmates with regard to their ability to access these personal items.

60.    On February 17, 2014, Plaintiff appealed from the second level response. She clearly articulated that she was seeking SRS because of her "serious medical needs" and that SRS is a treatment under the "acceptable standards of care." She also renewed her appeal for the personal items, explaining that she had specified which female clothing and accessories that she was requesting access to; *i.e.*, the ones available "for special purchase" within the vendor catalog sections that already were approved for inmates in female institutions.

61.    Plaintiff's appeal was not addressed at the third level until November 3, 2014 – almost nine months after she sought review and approximately five months after Dr. Bloch, a psychologist employed by CDCR, analyzed Plaintiff's repeated requests for SRS and determined it to be medically necessary. Dr. Bloch's assessment appears to have been undertaken directly in

response to Plaintiff's 602 appeal.

62.     At the third level of appeal, Defendant J. Lewis denied Plaintiff's appeal and determined that the decision exhausted Plaintiff's administrative remedies.  Defendant Lewis's third level appeal decision stated "[a]t this time it remains unclear whether you are currently seeking SRS as a medically necessary treatment.  Your appeal documents indicate that you would like SRS available 'at some point' and as an 'option.'"  This pretextual explanation is nothing more than an attempt to disguise Defendant Lewis's deliberate indifference to Plaintiff's suffering and a wanton disregard of her medical needs.  Plaintiff has been in prison for a great deal of time, and her use of the phrase "at some point" was clearly no more than an acceptance of the reality that she cannot simply obtain the medically necessary treatment when she would like it, but that she must wait until it is formally approved.

63.     That the documents that Plaintiff submitted in support of her appeal make clear that she was seeking SRS is evident from the fact that the second level reviewer specifically addressed the request for SRS and the fact that the forms repeatedly reference SRS as part of the treatment Plaintiff seeks.  Moreover, Plaintiff's records reviewed by Defendant Lewis in considering the appeal make clear that Plaintiff repeatedly has sought SRS as a medical treatment for the severe anxiety and mental anguish she suffers as a result of her gender dysphoria, even after years of hormone therapy.  Indeed, Plaintiff pursued a 602 appeal seeking SRS as early as 2009.  Similarly, in a September 15, 2013 Health Care Services Request, Plaintiff states unequivocally "I'm seeking reassignment sex-change surgery," and states that she is seeking all three elements of "triadic therapy," one of which is surgery.

64.     Defendant Lewis's assertion, seven months after Plaintiff received her second-level appeal denial, that a determination of medical necessity is "time-specific" and thus that she must reapply, shows deliberate indifference to Plaintiff's well-documented medical needs.  Defendant Lewis failed to take any reasonable measures to address the ongoing mental anguish that Plaintiff suffers as a result of her gender dysphoria, which is not fully addressed by the feminizing hormone therapy treatments that Plaintiff has been receiving since 2009.  Remarkably, Defendant Lewis completely ignores the April 11, 2014 recommendation by Dr. Bloch that SRS

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 25502719.5

15

FIRST AMENDED COMPLAINT

was medically necessary to treat Plaintiff's gender dysphoria.  Even if Dr. Bloch had not made

the recommendation that SRS was medically necessary for Plaintiff five months prior to her

appeal being denied,  Plaintiff's medical records make clear that Plaintiff had been living as a

woman and receiving feminizing hormone therapy since 2009 but still experienced (and continues

to experience) significant distress, anxiety and suicidal thoughts and behaviors as a result of the

discrepancy between her remaining male sex characteristics, and her female gender identity and

thus that SRS is medically necessary treatment for her.

65.     Defendant Lewis's denial of Plaintiff's request for medically necessary SRS was

unreasonable and manifested a wanton disregard for appropriate treatment of Plaintiff's gender

dysphoria based upon her history documented in her medical records and the prudent professional

standards embodied by the WPATH Standards of Care.  Defendant Lewis's explanation is a

pretext; the denial of Plaintiff's request for SRS illustrates the blanket custom and/or policy of the

CDCR that prohibits SRS for transgender individuals, in direct disregard of applicable medical

standards and the medical necessity of the treatment for individuals such as Plaintiff.

66.     Moreover, Defendant Lewis's apparent reliance on his own, non-specialized

opinion to deny SRS evidences his deliberate indifference.  Had Defendant Lewis taken

Plaintiff's condition and request seriously, he would have authorized the medically necessary

treatment based upon Dr. Bloch's report and/or referred Plaintiff to a specialist with the requisite

expertise and experience to assess Plaintiff's medical needs.

67.     Defendant Lewis's cursory denial of Plaintiff's request for access to vendor pre-

approved personal items available for female inmates because the items purportedly are

"controlled by custody and not under the jurisdiction of health care services" also is pretextual in

nature.  Dr. Bloch's report makes it clear that these types of items *are* a medical treatment, noting

that the items "would enhance the patient's ability to function comfortably in [her] environment .

. .."  Failure to analyze access to these items as a medical treatment for Plaintiff's gender

dysphoria or direct the appeal of this to the appropriate correctional officials was unreasonable

and manifested a wanton disregard for Plaintiff's medical needs.

Morgan, Lewis &
Bockius LLP
Attorneys at Law
San Francisco

DB2/ 25502719.5

16

FIRST AMENDED COMPLAINT

IV.    **CALIFORNIA CODE OF REGULATIONS TITLE 15, SECTION 3350.1 IS DISCRIMINATORY AND DOES NOT IMMUNIZE DEFENDANTS' UNCONSTITUTIONAL DENIAL OF SRS**

68.     Defendants' refusal to provide SRS to Plaintiff is not justified by California Code of Regulations ("C.C.R.") Title 15, Section 3350.1, which identifies vaginoplasty as a "[s]urgery not medically necessary [that] shall not be provided" except for cystocele or rectocele (conditions involving damages to the vaginal wall) unless the patient's attending physician prescribes the treatment and "[t]he service is approved by the medical authorization review committee and the health care review committee."  15 C.C.R. § 3350.1(b)(2); 15 C.C.R. § 3350.1(d).  It is also not justified by the Department Operations Manual, section 91020.26, a section captioned "Gender Dysphoria Treatment," that provides for a strict bar on SRS for inmates in CDCR custody: "Implementation of surgical castration, vaginoplasty, or other such procedures shall be deferred beyond the period of incarceration. Surgical procedure shall not be the responsibility of the Department."

69.     As a preliminary matter, this regulatory scheme is facially discriminatory against transgender women inmates because it makes vaginoplasty *de facto* unavailable for such inmates but allows the treatment for non-transgender female inmates with certain conditions such as cystocele.  The regulation singles out inmates assigned male at birth, and transgender women inmates in particular, for discriminatory treatment by establishing onerous, significant barriers that have the effect of barring them from obtaining vaginoplasty or castration even when, as here, it is medically necessary.

70.     Moreover, this policy was applied by each of the Defendants in a manner that discriminated against Plaintiff on the basis of her status as an inmate assigned male at birth, and a transgender woman in particular.  Each of the Defendants failed to give proper consideration to whether or not SRS was a medical necessity for the treatment of Plaintiff's gender dysphoria and based their conclusions on different factors and processes than they would have in determining the appeal of a non-transgender inmate's request for medically necessary surgery.  Each Defendant regarded and applied the policy as a *de facto* bar to Plaintiff's request for SRS – and vaginoplasty in particular – solely as the result of Plaintiff being assigned male at birth, and her

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 25502719.5

17

FIRST AMENDED COMPLAINT

status as a transgender woman in particular.

71.     Finally, each of the Defendants discriminated against Plaintiff and manifested deliberate indifference to the mental anguish and suffering still resulting from her gender dysphoria by failing to prescribe SRS, to follow the medical standards of care established by WPATH, or even to follow Defendants' own discriminatory policy and refer Plaintiff's SRS for approval by the medical authorization review committee and the health care review committee pursuant to 15 C.C.R. § 3350.1(d).

72.     Plaintiff continues to suffer deep anxiety and distress as a result of the discrepancy between her female gender identity and her remaining male sex characteristics, including male genitalia. Plaintiff's mental anguish is intensified by the fact – repeatedly established in her medical records – that Plaintiff has been taking female hormone therapy since 2009, yet is being forced to live every minute of every day in a body with male genitalia that does not match her deeply rooted female identity, causing her extreme distress, including suicidal ideation and suicide attempts.

## **COUNT ONE**

VIOLATION OF 42 U.S.C. § 1983 BASED UPON
DEPRIVATION OF EIGHTH AMENDMENT RIGHTS RESULTING FROM
FAILURE TO PROVIDE MEDICALLY NECESSARY SURGERY

73.     Plaintiff repeats and realleges the allegations of Paragraphs 1 through 72 as if fully set forth herein.

74.     Plaintiff has been diagnosed with the serious medical condition of gender dysphoria which, despite more than five years of feminizing hormone therapy, continues to cause Plaintiff serious mental distress, and requires treatment in the form of SRS as prescribed by CDCR psychologist Dr. Bloch, and supported by Plaintiff's medical records and prevailing medical standards of care.

75.     Each Defendant – acting in his/her official capacity and under color of state law – was and remains deliberately indifferent to Plaintiff's medical need for SRS. Each Defendant knew of Plaintiff's serious medical need for SRS and disregarded Plaintiff's need and failed to

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 25502719.5

18

FIRST AMENDED COMPLAINT

take any reasonable measures to address Plaintiff's continued pain and suffering resulting from her gender dysphoria. The deliberate indifference of each Defendant is further demonstrated by that Defendant's unreasonable reliance on his/her own conclusions or those of other non-specialized individuals rather than the conclusions and recommendations of a health care professional with sufficient training and experience in the treatment of gender dysphoria.

76.     Defendants' continued denial of SRS is causing irreparable harm to Plaintiff, including severe anxiety and distress as a result of the discrepancy between her remaining male sex characteristics, including male genitalia, and her female gender identity and appearance. Plaintiff's mental anguish is intensified by the fact – repeatedly established in her medical records – that Plaintiff has been receiving female hormone therapy since 2009, and is "effectively living the life of a woman in a male prison," yet is being forced to live every minute of every day in a body with male genitalia that does not match her biology. The denial of SRS also unreasonably and recklessly places Plaintiff at increased risk for heart and vascular conditions and certain types of cancer, particularly given that she has Hepatitis C, which risks could be substantially reduced as a result of the substantially reduced hormone treatments that would be required following SRS.

77.     By failing to provide SRS to Plaintiff while incarcerated, Defendants have deprived Plaintiff of her right to medically necessary treatment guaranteed by the Eighth Amendment to the United States Constitution.

## COUNT TWO

**VIOLATION OF 42 U.S.C. § 1983 BASED UPON DEPRIVATION OF FOURTEENTH AMENDMENT RIGHT TO EQUAL PROTECTION BY REFUSING PLAINTIFF SRS ON THE BASIS OF GENDER AND TRANSGENDER STATUS**

78.     Plaintiff repeats and realleges the allegations of Paragraphs 1 through 77 as if fully set forth herein.

79.     California Code of Regulations ("C.C.R.") Title 15, Section 3350.1 identifies vaginoplasty as a "[s]urgery not medically necessary [that] shall not be provided" except for cystocele or rectocele unless the patient's attending physician prescribes the treatment and "[t]he service is approved by the medical authorization review committee and the health care review

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 25502719.5

19

FIRST AMENDED COMPLAINT

committee." 15 C.C.R. § 3350.1(b)(2); 15 C.C.R. § 3350.1(d).

80.     Additionally, the CDCR Department Operations Manual section 91020.26, a section captioned "Gender Dysphoria Treatment," provides for a strict bar on SRS for inmates in CDCR custody: "Implementation of surgical castration, vaginoplasty, or other such procedures shall be deferred beyond the period of incarceration. Surgical procedure shall not be the responsibility of the Department."

81.     As a preliminary matter, this regulatory scheme is facially discriminatory against transgender women inmates because it makes vaginoplasty *de facto* unavailable for such inmates but allows the treatment for non-transgender female inmates with certain conditions such as cystocele. The regulation singles out inmates assigned male at birth, and transgender women inmates in particular, for discriminatory treatment by establishing onerous, significant barriers that have the effect of barring them from obtaining vaginoplasty or castration even when, as here, it is medically necessary.

82.     Each Defendant applied the statute in a manner that discriminated against Plaintiff on the basis of her gender and transgender status. In considering Plaintiff's need for SRS, each Defendant failed to give proper consideration to the specific circumstances of Plaintiff's gender dysphoria and need for SRS but instead either ignored Plaintiff's requests or based their conclusions on factors and processes that they would not have considered in determining the medical necessity of a treatment for a non-transgender inmate's request for medically-necessary surgery. Each Defendant regarded and applied the policy as a *de facto* bar to Plaintiff's request for SRS – and vaginoplasty in particular – solely as the result of Plaintiff being assigned male at birth, and a transgender woman in particular.

83.     Finally, each Defendant discriminated against Plaintiff and manifested deliberate indifference to the mental anguish and suffering still resulting from her gender dysphoria by failing to prescribe SRS or follow the medical standards of care established by WPATH.

84.     Defendants intentionally treat Plaintiff differently from non-transgender female inmates seeking vaginoplasty due to her gender and transgender status.

85.     Due to the difference in treatment, similarly situated non-transgender women with

serious medical needs are able to receive adequate medical care, including medically necessary vaginoplasty, but inmates assigned male at birth and transgender inmates requiring such treatment are either barred from receiving it or, at a minimum, held to a more onerous standard.

86.     The difference in treatment between transgender women and non-transgender women does not further any important government interest in a way that is substantially related to that interest, nor is it rationally related to any legitimate government interest.

87.     Defendants' discriminatory denial of SRS is causing irreparable harm to Plaintiff, including severe anxiety and distress as a result of the discrepancy between her remaining male sex characteristics and her female gender identity.  Plaintiff's mental anguish is intensified by the fact – repeatedly established in her medical records – that Plaintiff is living as a woman and has been receiving female hormone therapy since 2009, yet is being forced to live every minute of every day in a body with male genitalia that does not match her deeply rooted identity.  The denial of SRS also unreasonably and recklessly places Plaintiff at increased risk for heart and vascular conditions and certain types of cancer, particularly given that she has Hepatitis C, which risks could be substantially reduced as a result of the substantially reduced hormone treatments that would be required following SRS.  By failing to provide SRS to Plaintiff while incarcerated, Defendants have deprived Plaintiff of her right to equal protection of the laws guaranteed by the Fourteenth Amendment to the United States Constitution.

## COUNT THREE

VIOLATION OF 42 U.S.C. § 1983 BASED UPON DEPRIVATION OF FOURTEENTH AMENDMENT RIGHT TO EQUAL PROTECTION BY REFUSING PLAINTIFF ACCESS TO PERSONAL ITEMS APPROVED AND AVAILABLE TO INMATES IN FEMALE INSTITUTIONS ON THE BASIS OF GENDER AND TRANSGENDER STATUS

88.     Plaintiff repeats and realleges the allegations of Paragraphs 1 through 87 as if fully set forth herein.

89.     CDCR's policy, implemented by Defendants, discriminates against transgender women inmates by refusing access to clothing, cosmetic and hygiene items that are approved and available to cisgender women inmates.  The policy singles out inmates assigned male at birth, and transgender women in particular, by placing onerous, significant barriers to obtaining these

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 25502719.5

21

FIRST AMENDED COMPLAINT

products, which would enhance these inmates' ability to function comfortably in their environment.

90.     Each of the Defendants applied the policy in a manner that discriminated against Plaintiff on the basis of her gender and transgender status.  In considering Plaintiff's ability and need to access these pre-approved special purchase products, each Defendant failed to give proper consideration to the specific circumstances of Plaintiff's request and instead either ignored Plaintiff's requests or based their denial of her requests on a blanket discriminatory policy and/or bias against transgender women inmates.  Each Defendant regarded and applied the policy as a bar to Plaintiff's request for access to these pre-approved personal items solely as the result of Plaintiff being assigned male at birth, and a transgender woman in particular.

91.     Defendants intentionally treat Plaintiff differently from non-transgender female inmates seeking access to these pre-approved personal items due to her gender and transgender status.

92.     Due to the difference in treatment, similarly situated non-transgender women are able to receive access to these personal items, but inmates assigned male at birth and transgender inmates requiring or desiring such products are barred from receiving them.

93.     The difference in treatment between transgender women and non-transgender women does not further any important government interest in a way that is substantially related to that interest, nor is it rationally related to any legitimate government interest.

94.     Defendants' discriminatory denial of access to these personal items is causing irreparable harm to Plaintiff, including severe anxiety and distress, and this discrimination further encourages the mistreatment of and discrimination against Plaintiff in other contexts and by other persons.

95.     By failing to provide access to these pre-approved special purchase items to Plaintiff while incarcerated, Defendants have deprived Plaintiff of her right to equal protection of the laws guaranteed by the Fourteenth Amendment to the United States Constitution.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants Beard, Pajong, Bright,

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 25502719.5

22

FIRST AMENDED COMPLAINT

Dunlap, Lewis, and Does 1-30 as follows:

96.     Enter injunctive relief enjoining Defendants from interfering with the discretion of the mental health and other medical professionals involved in Plaintiff's care;

97.     Enter injunctive relief declaring California Code of Regulations, Title 15, Section 3350.1(b)(2), CDCR Department Operations Manual section 91020.26, and CDCR's discriminatory restriction of women's items available for transgender female inmates unconstitutional on their face and as applied;

98.     Enter injunctive relief enjoining Defendants to provide Plaintiff with adequate medical care, including access to appropriate specialists and SRS;

99.     Enter injunctive relief enjoining Defendants to provide Plaintiff equal access to clothing, cosmetic and hygiene items available to inmates housed in female institutions;

100.    Award reasonable attorneys fees and costs to Plaintiff pursuant to 42 U.S.C. § 1988; and

101.    Such other relief as the Court finds appropriate in the interests of justice.


Dated: December 10, 2014                    MORGAN, LEWIS & BOCKIUS LLP


By      /s/ - Herman J. Hoying
        HERMAN J. HOYING
        MORGAN, LEWIS & BOCKIUS LLP
        One Market, Spear Street Tower
        San Francisco, California  94105-1126
        Telephone:      415.442.1000
        Facsimile:      415.442.1001
        hhoying@morganlewis.com


        Attorneys for Plaintiff

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 25502719.5

23

FIRST AMENDED COMPLAINT