1   KAMALA D. HARRIS
    Attorney General of California
2   JAY C. RUSSELL
    Supervising Deputy Attorney General
3   MARTINE N. D'AGOSTINO
    Deputy Attorney General
4   State Bar No. 256777
      455 Golden Gate Avenue, Suite 11000
5     San Francisco, CA  94102-7004
      Telephone:  (415) 703-5233
6     Fax:  (415) 703-5843
      E-mail:  Martine.DAgostino@doj.ca.gov
7   *Attorneys for Defendants*
    *S. Pajong, D. Bright, J. Lewis, J. Dunlap, and*
8   *J. Beard, Ph.D.*

9                 IN THE UNITED STATES DISTRICT COURT

10            FOR THE NORTHERN DISTRICT OF CALIFORNIA

11                      SAN FRANCISCO DIVISION

12

13

14   **SHILOH HEAVENLY QUINE,**              C 14-02726 JST

15                             Plaintiffs,   **JOINT NOTICE OF SETTLEMENT**
                                             **AGREEMENT**
16            **v.**

17                                           Judge:        The Honorable Jon S. Tigar
     **BEARD, et al.,**                      Trial Date:   January 4, 2016
18                                           Action Filed: June 12, 2014
                              Defendants.
19

20

21

22

23

24

25

26

27

28

                                      1

1    The parties, by and through their counsel of record, have agreed to settle the instant matter.

2    The parties will execute the attached Settlement Agreement and Release within the next seven

3    calendar days.

4
5    DATED: August 7, 2015

6        /s/ Herman J. Hoying                          /s/ Martine N. D'Agostino

7        _____                  _____
         HERMAN J. HOYING[1]                           MARTINE N. D'AGOSTINO
8        Attorney for Plaintiff                        Deputy Attorney General
         Shiloh Quine (aka Rodney James Quine)         Attorney for Defendants
9                                                       S. Pajong, D. Bright, J. Lewis, J.
                                                        Dunlap, and J. Beard, Ph.D.
10

11   SF2015400052
12   20769978.doc

13

14

15

16

17

18

19

20

21

22

23

24

25

26   _____
        [1] Under Northern District Local Rule 5-1(i)(3), counsel for Defendants attests that
27   Plaintiff's counsel gave his permission to electronically sign this stipulation on his behalf.

28

2

# SETTLEMENT AGREEMENT AND RELEASE

## I. PARTIES

This Settlement Agreement and Release (Agreement) is made between SHILOH
HEAVENLY (aka Rodney James) QUINE (Plaintiff) and the California Department of
Corrections and Rehabilitation (CDCR) on behalf of Defendants BEARD, PAJONG, LEWIS,
BRIGHT, and DUNLAP (Defendants).  Plaintiff, CDCR, and Defendants are referred to as "the
parties."  This Agreement covers all of the claims and allegations in the Complaint and any
amendments in it against Defendants, whether named or unnamed and whether served or
unserved, and any past or current CDCR employees.

## II. RECITALS

Plaintiff filed a complaint in the United States District Court for the Northern District of
California, *RODNEY JAMES QUINE v. BEARD, et al.*, Case No. C 14-02726 JST (N.D. Cal.)
(the Complaint), seeking an order requiring Defendants to provide Plaintiff with sex-
reassignment surgery as a medically necessary treatment for her gender dysphoria and access to
property available to CDCR inmates housed in female facilities.  Defendants and CDCR deny all
allegations of wrongdoing made by Plaintiff in this lawsuit.  However, the parties acknowledge
that several medical and mental health clinicians, including two independent mental health
experts, have determined that sex-reassignment surgery is a medically necessary treatment for
Plaintiff.  (See Attachments A & B.)  No medical or mental health clinician has indicated
otherwise.  Accordingly, the parties now desire and intend by this Agreement to settle all
disputes between them relating in any way to the Complaint's allegations and claims, including
any rights to appeal, and to discharge each other from any and all liability with reference to such
allegations and claims, except as specifically set forth in this Agreement.

Therefore, in consideration of the covenants set forth in this Agreement, the parties settle
their dispute on the terms and conditions set forth below.

## III. TERMS AND CONDITIONS

1.      In full and complete settlement of any and all claims, the parties agree to the
following:

    A.  As promptly as possible, Plaintiff shall be referred for genital sex-
reassignment surgery to a mutually agreed-upon surgical practice (the surgical
practice).  CDCR shall negotiate the contract with the surgical practice, who
shall provide Plaintiff's genital sex-reassignment surgery.

    B.  The surgical practice shall evaluate Plaintiff for genital sex-reassignment
surgery, i.e. surgery to transform the appearance and function of Plaintiff's
genitals to appear as female.

    C.  If the surgical practice determines that Plaintiff is not a candidate for genital
sex-reassignment surgery, that determination shall be delivered to all parties.

Plaintiff shall then be re-evaluated by a second mutually agreed-upon surgical practice for a second evaluation and surgery.

D.   Plaintiff's genital sex-reassignment surgery shall proceed under the surgical practice's recommendations.

E.   Following completion of genital sex-reassignment surgery, it is anticipated that Plaintiff will require a period of post-surgery hospitalization and recovery.  Following discharge, Plaintiff shall be placed as a female inmate in a CDCR facility that houses female inmates consistent with Plaintiff's custody and classification factors.

F.   Plaintiff shall be issued a correctional chrono allowing her access to property items available to CDCR inmates consistent with her custody and classification factors, including property items that are designated as available to female inmates only.

G.   CDCR shall review and revise its policies to allow inmates identified by medical or CDCR personnel as transgender or having symptoms of gender dysphoria access to property items available to CDCR inmates consistent with those inmates' custody and classification factors, including property items that are designated as available to a specific gender only.  Before those policies are final, Plaintiff shall have the opportunity to comment on its specific language, including provisions that limit certain property because of safety and security concerns.  In addition, CDCR is reviewing and revising its policies concerning medically necessary treatment for gender dysphoria, including surgery.

H.   The Court shall retain jurisdiction of this litigation while this Agreement's terms are being executed.  Any disputes between the parties concerning this Agreement shall first be presented to Magistrate Judge Nandor J. Vadas for informal dispute resolution without prejudice to a party's right to seek formal relief from the Court.

I.   Upon execution of all of this Agreement's terms, Plaintiff agrees to dismiss the Complaint with prejudice.

2.   There are no other actions required by Defendants or CDCR to comply with this Agreement.  Except as described in Paragraph 1.G. above, any and all actions taken under this Agreement shall be limited in scope and application to this case and Plaintiff only.

3.   Plaintiff shall be entitled to reasonable attorney's fees and costs incurred in this litigation at the rate applicable under the Prison Litigation Reform Act.

## IV.  GENERAL RELEASE

4.   By signing this Agreement, the parties intend that it shall be a full and final accord and satisfaction and release from all allegations and claims asserted in the Complaint.

A. By signing this Agreement, Plaintiff releases CDCR, Defendants, California Correctional Health Care Services (CCHCS), whether named or unnamed and whether served or unserved, and any other past or current CDCR and CCHCS employees, including the receiver appointed in *Plata v. Brown,* Case No. C01-1351 TEH (N.D. Cal.), from all claims, past, present and future, known or unknown, that arise or could arise from the facts alleged in the Complaint or from this lawsuit.

B. By signing this Agreement, CDCR, Defendants, California Correctional Health Care Services (CCHCS), whether named or unnamed and whether served or unserved, and any other past or current CDCR and CCHCS employees, including the receiver appointed in *Plata v. Brown,* Case No. C01-1351 TEH (N.D. Cal.), release Plaintiff from all claims, past, present and future, known or unknown, that arise or could arise from the facts alleged in the Complaint or this lawsuit.

5.     In furtherance of this intention, the parties acknowledge that they are familiar with, and expressly waive, the provisions of California Civil Code section 1542, which states:

A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor.

6.     This Agreement is the compromise of various disputed claims and shall not be treated as an admission of liability by any of the parties for any purpose.  The signature of or on behalf of the respective parties does not indicate or acknowledge the validity or merits of any claim or demand of the other party.

## V.  SUCCESSORS AND ASSIGNS

7.     This Agreement shall be binding on the parties and their respective officers, agents, administrators, successors, assignees, heirs, executors, trustees, attorneys, consultants, and any committee or arrangement of creditors organized with respect to the affairs of any such party.

## VI.  REPRESENTATIONS AND WARRANTIES

8.     <u>No other consideration</u>.  The consideration recited in this Agreement is the only consideration for this Agreement, and no representations, promises, or inducements have been made to the parties, or any of their representatives, other than those set forth in this Agreement.

9.     <u>Execution in counterpart</u>.  This Agreement may be executed simultaneously in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

10.   <u>Execution of further documents</u>.  Each party to this Agreement shall complete, execute or cause to be executed such further and other documents as are necessary to carry out the expressed intent and purpose of this Agreement.

11.   <u>Entire agreement</u>.  This Agreement constitutes a single, integrated agreement expressing the entire agreement of the parties, and there are no other agreements, written or oral, express or implied, between the parties, except as set forth in this Agreement.

12.   <u>No oral modifications or waiver</u>.  No supplement, modification, or amendment to this Agreement shall be binding unless executed in writing by all the parties.  No waiver of any provision of this Agreement shall be binding unless executed in writing by the party making the waiver.  No waiver of any provision of this Agreement shall be deemed, or shall constitute, a waiver of any other provision, whether or not similar, nor shall any waiver constitute a continuing waiver.

13.   <u>Governing law</u>.  Unless expressly stated otherwise in this Agreement, the terms, conditions, and provisions of this Agreement are governed by and interpreted under California state law.

14.   <u>Severability</u>.  Should any provision of this Agreement be held invalid or illegal, such illegality shall not invalidate the whole of this Agreement, but the Agreement shall be construed as if it did not contain the illegal part, and the rights and obligations of the parties shall be construed and enforced accordingly.

The undersigned agree to the above:

Dated: _____      By: _____
                              Shiloh Quine


Dated: _____      By: _____
                              Dr. Jeffrey Beard
                              Secretary, California Department of Corrections and
                              Rehabilitation

Approved as to form:

Dated: 8/07/15                By: _____
                              Herman J. Hoying
                              Morgan, Lewis & Bockius

Dated: August 7 2015          By: _____
                              Jay C. Russell, Supervising Deputy Attorney
                              General
                              Counsel for Defendants

_____

*SHILOH QUINE v. BEARD, et al.*, Case No. C 14-02726 JST
Settlement Agreement and Release

# ATTACHMENT A

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHILOH QUINE (a/k/a RODNEY JAMES QUINE), | Case No. C 14-02726 JST |
| Plaintiff, | **EXPERT DECLARATION OF DR. RANDI C. ETTNER** |
| v. | |
| JEFFREY BEARD; S. PAJONG; D. BRIGHT; J. DUNLAP; J. LEWIS; and DOES 1-30, | |
| Defendants. | |

1.     I, Randi C. Ettner, have been retained by Plaintiff Shiloh Quine, by and through counsel, to provide my expert evaluation and opinion regarding Ms. Quine's mental health condition and the appropriateness of the mental health treatment provided to Ms. Quine by the California Department of Corrections and Rehabilitation ("CDCR"), including through the named defendants in this lawsuit, whom I understand to have been CDCR employees or agents during the relevant period.  This declaration provides my opinions and conclusions, including (i) scientific information regarding gender dysphoria and its impact on the health and well-being of individuals inflicted with it; (ii) information regarding best practices and the generally accepted standards of care for individuals with gender dysphoria, including the efficacy of sex reassignment surgery as a treatment for gender dysphoria; and (iii) the results of my evaluation of

Ms. Quine and recommendations with regard to her treatment.  I have actual knowledge of the matters stated herein and could and would so testify if called as a witness.

## I.       QUALIFICATIONS

2.       I received my doctorate in psychology from Northwestern University in 1979.  I have been involved in treating patients with gender dysphoria[1] since 1977, when I was an intern at the Cook County Hospital.

3.       Since that time I have developed significant experience and expertise in the treatment of individuals with gender dysphoria.  In 2005, I was involved in establishing the Chicago Gender Center, which specializes in the treatment of individuals with gender dysphoria, and have served as the chief psychologist at the Chicago Gender Center since 2005.

4.       During the course of my career, I have evaluated and/or treated between 2,500 and 3,000 individuals with gender dysphoria and mental health issues related to gender variance.

5.       I have published three books related to the treatment of individuals with gender dysphoria,  including the medical text entitled *Principles of Transgender Medicine and Surgery* (co-editors Monstrey & Eyler; Routledge, 2007).  In addition, I have authored numerous articles in peer-reviewed journals regarding the provision of health care to this population.  I have served as a member of the University of Chicago Gender Board, and am a member of the editorial board for the International Journal of Transgenderism.

6.       I am a member of the Board of Directors of the World Professional Association for Transgender Health (WPATH) (formerly the Harry Benjamin International Gender Dysphoria Association), and an author of the WPATH Standards of Care for the Health of Transsexual, Transgender and Gender-nonconforming People (7th version), published in 2012.

---

[1] The American Psychiatric Association published a revised version of its Diagnostic and Statistical Manual of Mental Disorders ("DSM-V") in 2013, which replaced the "gender identity disorder" diagnosis with "gender dysphoria."  For consistency, I will refer to the condition as "gender dysphoria" throughout my report, even when making reference to the condition prior to 2013.

7.     I have lectured throughout North America and Europe on topics related to gender dysphoria.  On numerous occasions, I have given grand rounds presentations on gender dysphoria at medical hospitals.

8.     I have been retained as an expert regarding gender dysphoria and the treatment of gender dysphoria in multiple court cases and administrative proceedings, including cases involving the treatment of individuals with gender dysphoria in prison settings.  I was deposed as an expert in the following cases over the past four years:  *Jane Doe v. Clenchy, et al.*, No. CV-09-201 (Me. Super. Ct. 2011); *Kothmann v. Rosario*, No. 13-CV-28-OC22 (D. Fla. 2013).  In *Fields v. Smith*, No. 06-C-112 (E.D. Wisc. 2006), I provided testimony in court and was qualified as an expert.

9.     In addition, I have been a consultant to news media and have been interviewed as an expert on gender dysphoria for hundreds of television, radio and print articles throughout the country.

10.    My consulting fee in this case is $250 per hour.

11.    A true and correct copy of my Curriculum Vitae (CV), which provides a complete overview of my education, training, and work experience and a full list of my publications, is attached hereto as Exhibit A.

## II.      MATERIALS CONSIDERED

12.    I have considered information from various sources in forming my opinions enumerated herein, in addition to drawing on my extensive experience and review of the literature related to gender dysphoria over the past three decades.  A complete bibliography of the materials referenced in this report is attached hereto as Exhibit B.

13.    I also have reviewed the deposition testimony provided by Ms. Quine in this case on June 10, 2015 and the following medical records of Ms. Quine that I understand to have been produced in this case:  AGO 000023, AGO 003972-76,  AGO 003982-88, AGO 004011-12, AGO 004015-18, AGO 004027, AGO 004066-115, AGO 004298-304, AGO 004309-12, AGO 004849-51, AGO 005607-867, AGO 005998-6075.

14.     In addition, I have reviewed the documents pertaining to Ms. Quine's appeal within CDCR seeking sex reassignment surgery (AGO 010549-83) and the assessment, dated April 11, 2014, prepared by Dr. B. Bloch (AGO 005894-99).

15.     Finally, in preparation for this report, I conducted an interview of Ms. Quine on June 9, 2015 at Mule Creek State Prison in Ione, California.  During that interview, I conducted and subsequently reviewed and considered the following psychodiagnostic tests:

1.     Beck Depression Inventory-II,

2.     Beck Anxiety Inventory, and

3.     Beck Hopelessness Scale.

## III.     GENDER DYSPHORIA

16.     Gender dysphoria, formerly known as gender identity disorder (GID), is a serious medical condition codified in the International Classification of Diseases (10th revision; World Health Organization) and the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders–5th edition (DSM-V). The condition is characterized by an incongruence between one's experienced/expressed gender and assigned sex at birth, and clinically significant distress or impairment of functioning as a result. The suffering that arises from this condition has often been described as "being trapped in the wrong body." "Gender dysphoria" is also the psychiatric term used to describe the severe and unremitting emotional pain associated with the condition.

17.     The diagnostic criteria for gender dysphoria in adults are as follows:

A.     A marked incongruence between one's experienced/expressed gender and assigned gender, of at least 6 months' duration, as manifested by at least two of the following:

1.     A marked incongruence between one's experienced/expressed gender and primary and/or secondary sex characteristics.

2.     A strong desire to be rid of one's primary and/or secondary sex characteristics because of a marked incongruence with one's experienced/expressed gender.

3.     A strong desire for the primary and/or secondary sex characteristics of the other gender.

4.      A strong desire to be of the other gender (or some alternative gender different from one's assigned gender).

5. A strong desire to be treated as the other gender (or some alternative gender different from one's assigned gender).

6. A strong conviction that one has the typical feelings and reactions of the other gender (or some alternative gender different from one's assigned gender).

B. The condition is associated with clinically significant distress or impairment in social, occupational or other important areas of functioning.

18. Adults who manifest a severe degree of the disorder are commonly referred to as "transsexuals." Without treatment, individuals with gender dysphoria experience anxiety, depression, suicidality and other attendant mental health issues. (*See, e.g.*, Fraser, 2009; Schaefer & Wheeler, 2004; Ettner, 1999; Brown, 2000, DSM-V (2013)). They are also frequently socially isolated because they carry a burden of shame and low self-esteem, attributable to the feeling of being inherently "defective." This leads to stigmatization that over time proves ravaging to healthy personality development and interpersonal relationships. As a result, without treatment, many are unable to function effectively in occupational, social, or other important areas of daily living. A recent survey shows a 41% rate of suicide attempts among transgender people, far above the baseline rates for North America. (Haas, *et al.*, 2014).

19. Male-to-female transsexuals without access to appropriate care, particularly those who are imprisoned, are often so desperate for relief that they resort to life-threatening attempts at auto-castration—the removal of one's testicles—in the hopes of eliminating the major source of testosterone that kindles the distress. (Brown, 2010; Brown & McDuffie, 2009).

20. Gender dysphoria intensifies with age. Middle-aged and elderly gender dysphoric adults experience an exacerbation of symptoms. (Ettner, 2013; Ettner & Wiley, 2013).

## IV. TREATMENT OF GENDER DYSPHORIA

### A. WPATH Standards of Care

21. The standards of care for treating gender dysphoria are set forth in the World Professional Association for Transgender Health's Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People (WPATH Standards of Care). The WPATH Standards of Care are recognized as authoritative by the American Medical Association, the American Psychiatric Association, and the American Psychological Association. (*See*

MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

5    DECLARATION OF DR. RANDI ETTNER

American Medical Association (2008), Resolution 122 (A-08); American Psychiatric

Association-DSM-V; American Psychological Association Policy Statement on Transgender,

Gender Identity, and Gender Expression Non-discrimination (2009)).

22.     The Standards of Care identify the following treatment protocols for treating

individuals with gender dysphoria:

- Changes in gender expression and role (which may involve living part time or full time in another gender role, consistent with one's gender identity);
- Psychotherapy (individual, couple, family, or group) for purposes such as exploring gender identity, role, and expression; addressing the negative impact of gender dysphoria and stigma on mental health; alleviating internalized transphobia; enhancing social and peer support; improving body image; or promoting resilience;
- Hormone therapy to feminize or masculinize the body; and
- Surgery to change primary and/or secondary sex characteristics (*e.g.*, breasts/ chest, external and/or internal genitalia, facial features, body contouring).

23.     Once a diagnosis of gender dysphoria is made, a treatment plan should be

developed based on an individualized assessment of the medical needs of the particular patient.

24.     The development of any treatment plan and all subsequent treatment must be

administered by clinicians qualified in treating patients with gender dysphoria.

25.     The WPATH Standards of Care specify the qualifications that professionals must

meet in order to provide care to gender dysphoric patients.  (*See* Section VIII).  In particular, the

WPATH Standards of Care provide that a mental health professional must have "Knowledge

about gender-nonconforming identities and expressions, and the assessment and treatment of

gender dysphoria" and obtain continuing education in the assessment and treatment of gender

dysphoria.  Importantly, the WPATH Standards of Care require that "[m]ental health

professionals who are new to the field (irrespective of their level of training and other experience)

should work under the supervision of a mental health professional with established competence in

the assessment and treatment of gender dysphoria."

26.     In addition to these minimum credentials, clinicians working with gender

dysphoric patients should develop and maintain cultural competence to provide optimal care. A

1   growing body of scientific literature underlies this specialized area of medicine and presents

2   advances in treatment that inform care.

3         27.     To develop competence in the assessment and treatment of gender dysphoria,

4   clinicians should work under the supervision of mental health professionals with established

5   expertise in this area and pursue self-study. Self-study, however, cannot substitute for first-hand

6   clinical experience in treating the range of clinical presentations of gender dysphoria, or the

7   mentorship and supervision of an expert in this field.

8         28.     Treatment plans generated by providers lacking the requisite experience can result

9   in inappropriate care, or place patients at significant medical risk.

10        29.     Like protocols for the treatment of diabetes or other medical disorders, medical

11  management of gender dysphoria for incarcerated individuals does not differ from protocols for

12  non-institutionalized persons. For this reason, the WPATH Standards of Care expressly state that

13  all elements of the prescribed assessment and treatment are equally applicable to patients in

14  prison (Section XIV) and the National Commission on Correctional Health Care (NCCHC)

15  recommends treatment in accordance with the WPATH Standards of Care for people in

16  correctional settings.  (NCCHC Position Statement, Transgender, Transsexual, and Gender Non-

17  Conforming Health Care in Correctional Settings (October 18, 2009, reaffirmed with revisions

18  April 2015), http://www.ncchc.org/transgender-transsexual-and-gender-nonconforming-health-

19  care).

20        30.     Psychotherapy or counseling can provide support and help with the many issues

21  that arise in tandem with gender dysphoria. Counseling alone, however, is not a substitute for

22  medical intervention where medical intervention is needed, nor is it a precondition for such

23  intervention. By analogy, in Type One diabetes, counseling might provide psychoeducation about

24  living with a chronic condition, and information about nutrition, but it does not obviate the need

25  for insulin.

26        31.     For many individuals with gender dysphoria, changes to gender expression and

27  role to feminize or masculinize one's appearance, often called the "real life experience," are an

28  important part of treatment for the condition. This involves dressing, grooming and otherwise

outwardly presenting oneself through social signifiers of gender consistent with one's gender identity. This is an appropriate and necessary part of identity consolidation. Through this experience, the shame of growing up living as a "false self" and the grief of being born into the "wrong body" can be ameliorated.  (Greenberg and Laurence, 1981; Ettner, 1999; Devor, 2004; Bockting, 2007).

## B.   Hormone Therapy

32.   For individuals with persistent, well-documented gender dysphoria, hormone therapy is an essential and medically indicated treatment to alleviate the distress of the condition. Hormone therapy is a well-established and effective means of treating gender dysphoria. The American Medical Association, the Endocrine Society, the American Psychiatric Association and the American Psychological Association all agree that hormone therapy in accordance with the WPATH Standards of Care is medically necessary treatment for many individuals with gender dysphoria. (*See* American Medical Association (2008), Resolution 122 (A-08); Endocrine Treatment of Transsexual Persons: An Endocrine Society Clinical Practice Guideline (2009); American Psychological Association Policy Statement on Transgender, Gender Identity and Gender Expression Nondiscrimination (2009)).  Similarly, the NCCHC recognizes that hormone therapy should be provided to transgender inmates when determined to be medically necessary as a treatment for their gender dysphoria.  (NCCHC Position Statement, Transgender, Transsexual, and Gender Non-Conforming Health Care in Correctional Settings (April 2015)).

33.   The goals of hormone therapy for individuals with gender dysphoria are (i) to significantly reduce hormone production associated with the person's birth sex and, thereby, the secondary sex characteristics of the individual's birth sex and (ii) to replace circulating sex hormones associated with the person's birth sex with feminizing or masculinizing hormones, using the principles of hormone replacement treatment developed for hypogonadal patients (*i.e.*, males born with insufficient testosterone or females born with insufficient estrogen). (*See* Endocrine Treatment of Transsexual Persons: An Endocrine Society Clinical Practice Guideline (2009)).

34.     The therapeutic effects of hormone therapy are twofold: (i) with endocrine treatment, the patient acquires congruent sex characteristics, *i.e.* for transgender women, breast development, redistribution of body fat, cessation of male pattern baldness, and reduction of body hair; and (ii) hormones act directly on the brain, via receptors sites for sex steroids, which produces an attenuation of dysphoria and attendant psychiatric symptoms, and the promotion of a sense of well-being. (*See, e.g.*, Cohen-Kettenis & Gooren, 1992).

35.     The efficacy of hormone therapy to treat gender dysphoria is observed clinically and well documented in the literature. For example, in one study, researchers investigated 187 transsexual patients who had received hormones and compared them with a group who did not. Untreated patients showed much higher levels of depression, anxiety, and social distress. (Rametti, *et al.*, 2011; *see also* Colizzi, *et al.* 2014; Gorin-Lazard, *et al.*, 2011).

36.     Some individuals with gender dysphoria experience profound relief from hormone therapy alone such that further treatment, such as surgical intervention, is not required. (WPATH Standards of Care, 2013).

**C.     Sex Reassignment Surgery**

37.     For many individuals with severe gender dysphoria, however, hormone therapy and psychotherapy alone is insufficient. Relief from their dysphoria cannot be achieved without surgical intervention to modify primary sex characteristics, *i.e.*, genital reconstruction.

38.     Genital reconstruction surgery for male-to-female transsexuals has two therapeutic purposes: First, removal of the testicles eliminates the major source of testosterone in the body. Second, the patient attains body congruence resulting from the normal appearing and functioning female uro-genital structures. Both are critical in alleviating or eliminating gender dysphoria.

39.     Decades of careful and methodologically sound scientific research have demonstrated that sex reassignment surgery is a safe and effective treatment for severe gender dysphoria and, indeed, for many people, it is the only effective treatment. (*See, e.g.*, Pfafflin & Junge, 1998; Smith, *et al.*, 2005; Jarolim, *et al.*, 2009).

40.     WPATH , the American Medical Association, the Endocrine Society, and the American Psychological Association all support surgery in accordance with the WPATH

DECLARATION OF DR. RANDI ETTNER

Standards of Care as medically necessary treatment for individuals with severe gender dysphoria. (*See* American Medical Association (2008), Resolution 122 (A-08); Endocrine Treatment of Transsexual Persons: An Endocrine Society Clinical Practice Guideline (2009) ("For many transsexual adults, genital sex reassignment surgery may be the necessary step towards achieving their ultimate goal of living successfully in their desired gender role."); American Psychological Association Policy Statement on Transgender, Gender Identity and Gender Expression Nondiscrimination (2009) (recognizing "the efficacy, benefit and medical necessity of gender transition treatments" and referencing studies demonstrating the effectiveness of sex-reassignment surgeries)). In addition, the NCCHC recognizes that "[s]ex reassignment surgery should be considered on a case-by-case basis and provided when determined to be medically necessary" for incarcerated patients. (NCCHC Position Statement, Transgender, Transsexual, and Gender Non-Conforming Health Care in Correctional Settings (April 2015)).

41.     Surgeries are considered "effective" from a medical perspective if they "have a therapeutic effect" (Monstrey, *et al*., 2007). More than three decades of research confirms that sex reassignment surgery is therapeutic and therefore an effective treatment for gender dysphoria. Indeed, for many patients with severe gender dysphoria, sex reassignment surgery is the *only* effective treatment.

42.     In a 1998 meta-analysis, Pfafflin and Junge reviewed data from 80 studies, spanning 30 years, from 12 countries. They concluded that "reassignment procedures were effective in relieving gender dysphoria. There were few negative consequences and all aspects of the reassignment process contributed to overwhelmingly positive outcomes" (Pfafflin & Junge, 1998).

43.     Numerous subsequent studies confirm this conclusion. Researchers reporting on a large-scale prospective study of 325 individuals in the Netherlands concluded that after surgery there was "a virtual absence of gender dysphoria" in the cohort and "results substantiate previous conclusions that sex reassignment is effective" (Smith, *et al*., 2005). Indeed, the authors of the study concluded that the surgery "appeared therapeutic and beneficial" across a wide spectrum of

1   factors and "[t]he main symptom for which the patients had requested treatment, gender

2   dysphoria, had decreased to such a degree that it had disappeared."

3          44.     In 2007, Gijs and Brewayes analyzed 18 studies published between 1990 and

4   2007, encompassing 807 patients. The researchers concluded: "Summarizing the results from the

5   18 outcome studies of the last two decades, the conclusion that [sex reassignment surgery] is the

6   most appropriate treatment to alleviate the suffering of extremely gender dysphoric individuals

7   still stands: Ninety-six percent of the persons who underwent [surgery] were satisfied and regret

8   was rare."

9          45.     Studies conducted in countries throughout the world conclude that surgery is an

10  extremely effective treatment for gender dysphoria. For example, a 2001 study published in

11  Sweden states: "The vast majority of studies addressing outcome have provided convincing

12  evidence for the benefit of sex reassignment surgery in carefully selected cases" (Landen, 2001).

13  Similarly, urologists at the University Hospital in Prague, Czech Republic, in a Journal of Sexual

14  Medicine article concluded: "Surgical conversion of the genitalia is a safe and important phase of

15  the treatment of male-to-female transsexuals" (Jarolim, 2009).

16         46.     Patient satisfaction is an important measure of effective treatment.  Achieving

17  functional and normal physical appearance consistent with gender identity alleviates the suffering

18  of gender dysphoria and enables the patient to function in everyday life. Studies have shown that

19  by alleviating the suffering and dysfunction caused by severe gender dysphoria, sex reassignment

20  surgery improves virtually every facet of a patient's life. This includes satisfaction with

21  interpersonal relationships and improved social functioning. ((Rehman, *et al.*, 1999; Johansson, *et

22  al*., 2010; Hepp, *et al*,. 2002; Ainsworth & Spiegel, 2010; Smith, *et al.*, 2005); improvement in

23  self-image and satisfaction with body and physical appearance (Lawrence, 2003; Smith, *et al.*,

24  2005; Weyers, *et al.*, 2009); and greater acceptance and integration into the family (Lobato, *et al.*,

25  2006)).

26         47.     Studies have also shown that surgery improves patients' abilities to initiate and

27  maintain intimate relationships (Lobato, *et al.,* 2006; Lawrence, 2005; Lawrence, 2006; Imbimbo,

28

1  *et al.,* 2009; Klein & Gorzalka, 2009; Jarolim, *et al.,* 2009; Smith, *et al.,* 2005; Rehman, *et al.,*

2  1999; DeCuypere, *et al.,* 2005).

3         48.    Multiple long term studies have confirmed these results.  (*See, e.g.,*

4  "Transsexualism in Serbia: a twenty-year follow-up study" (Vujovic, *et al.,* 2009); "Long-term

5  assessment of the physical, mental, and sexual health among transsexual women" (Weyers,

6  2009); "Treatment follow-up of transsexual patients" (Hepp, *et al.,* 2002); "A five-year follow-up

7  study of Swedish adults with gender identity disorder" (Johansson, *et al.,* 2010); "A report from a

8  single institute's 14 year experience in treatment of male- to-female transsexuals" (Imbimbo, *et*

9  *al.,* 2009); 'Followup of sex reassignment surgery in transsexuals: a Brazilian cohort" (Lobato, *et*

10  *al.,* 2006)).

11         49.    Given the extensive experience and research supporting the effectiveness of sex

12  reassignment surgery spanning decades, it is clear that sex reassignment surgery is a medically

13  necessary, not experimental, treatment for gender dysphoria as demonstrated by its recognition by

14  various medical organizations as a medically necessary treatment for gender dysphoria.

15         50.    In 2008, WPATH issued a "Medical Necessity Statement" expressly stating:

16  "These medical procedures and treatment protocols are not experimental:  decades of both clinical

17  and medical research show they are essential to achieving well-being for the transsexual patient."

18         51.    Similarly, Resolution 122 (A-08) of the American Medical Association states:

19  "Health experts in GID, including WPATH, have rejected the myth that these treatments are

20  'cosmetic' or 'experimental' and have recognized that these treatments can provide safe and

21  effective treatment for a serious health condition."

22         52.    On September 25, 2013 the Department of Health Care Services of the State of

23  California Health and Human Services Agency issues All Plan Letter 13-011, which makes clear

24  that gender reassignment surgery is a covered service for Medi-Cal beneficiaries and referred

25  providers to the WPATH Standards of Care for the "criteria for the medical necessity of

26  transgender services."

27         53.    On May 30, 2014, the Appellate Division of the Departmental Appeals Board of

28  the United States Department of Health and Human Services issued decision number 2576, in

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

                                          12              DECLARATION OF DR. RANDI ETTNER

1  which the Board determined that a Medicare regulation denying coverage of "all transsexual

2  surgery as a treatment for transsexualism" was not valid under the "reasonableness standard."

3  The Board specifically concluded that "transsexual surgery is an effective treatment option for

4  transsexualism in appropriate cases."

5  **V.      EVALUATION AND RECOMMENDATION REGARDING MS. QUINE**

6          **A.      Relevant Background History**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12



13      **B.**     <u>**Mental Status Examination**</u>

14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



**C.   Gender Dysphoria**

72.   A review of records reveals that beginning at least by 2008, Ms. Quine has consistently been diagnosed with gender dysphoria (or gender identity disorder).

73.   She has been treated with hormone therapy since 2009.  As a result of long-term hormonal usage, she is now *hormonally reassigned*. That is to say, she has female secondary sex characteristics and sex steroid levels corresponding to an adult female—*i.e.*, increased size of areolae with breast tissue expansion, a redistribution of body fat in the hips and buttocks in an estrogen-distribution pattern, diminished size and volume of the testes, reduction in prostate size, and hormone levels that match that of an adult female. She has changed the social aspects of gender expression, which is often more challenging than changing physical characteristics, particularly in a prison setting.

74.   Ms. Quine has engaged in counseling, and has successfully consolidated her female identity. She has attempted to change her given name legally, and has relentlessly advocated for medical and surgical care, but her requests were denied by CDCR.

75.   Ms. Quine's intractable determination to live authentically and reduce the dysphoria, was the impetus to permanently tattoo facial make-up, as cosmetics are contraband. She has demonstrated resilience in her "real life experience", enduring harassment by staff and inmates, who refer to her as "dude" and make "puking" sounds in her presence. A barrage of research documents that stigma and humiliation combine with the unremitting pain of gender and anatomical incongruence, producing serious and enduring deterioration of mental and physical

DECLARATION OF DR. RANDI ETTNER

MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    health. (Jones, *et al*, 1984; Meyer, 2003; Nuttbrock, Hwang & Bockting, 2010; Nuttbrock, *et al*,

2    2013; Reisner, *et al*, 2014; Singh, Hays & Watson, 2011). In a context of discrimination, stigma

3    correlates not only with depression, but with physical health problems, such as hypertension and

4    cardioreactivity. (Ettner, White & Ettner, 2012).

5         76.    Despite years of feminizing hormone therapy, Ms. Quine continues to suffer from

6    gender dysphoria and attendant depression. Ms. Quine's dysphoria regarding her male genitalia

7    has intensified with long-term hormonal treatment. Having a female appearance and male

8    genitalia is the source of profound distress. Her inability to reduce or modulate this internal

9    anguish is likely to result in emotional decompensation and further self-harm.

10        77.    Clearly, after years of counseling and hormone therapy, Ms. Quine now requires

11   genital surgery. *i.e.,* the reconstruction of primary sex characteristics. Were Ms. Quine to undergo

12   this surgical procedure, her symptoms would be attenuated and possibly eliminated.

13       **D.**    **<u>Recommended Treatment</u>**

14        78.    The WPATH Standards of Care establish the following requirements for a patient

15   seeking sex reassignment surgery:

16           1.  Persistent, well-documented gender dysphoria.

17           2.  Capacity to make a fully-informed decision and to consent for treatment.

18           3.  Age of majority in a given country;

19           4.  If significant medical or mental health concerns are present, they must be well
     controlled.

20

21           5.  12 months of hormone therapy as appropriate to the patient's gender goals
     (unless hormones are not clinically indicated for the individual).

22           6.  12 continuous months of living in an identity-congruent gender role.

23        79.    Ms. Quine meets, and exceeds, the criteria for surgery: She has persistent, well-

24   documented gender dysphoria. She is free of any disorders of thought or impaired reality testing,

25   able to provide informed consent and to participate in decisions regarding her healthcare. She

26   understands the irrevocable nature of surgery and the potential for complications. Having been on

27   hormonal therapy for six years, irreversible anatomical changes have already eventuated. (*See,*

28   *e.g.*, Gooren & Delemarre-van de Waal, 2007; Fisher & Maggi, 2015). Since 2008, Ms. Quine has

1  consistently lived in her affirmed and well-consolidated female gender. She has no mental health

2  or medical concerns that contraindicate surgery. On the contrary, surgery is the therapeutic

3  intervention that would significantly improve her emotional and physical health.

4       80.     Owing to the severity of her gender dysphoria, the ensuing clinically significant

5  distress, and the limited efficacy of hormone therapy, reassignment surgery is medically

6  necessary for Ms. Quine, and should be implemented as soon as practical. Surgery would create

7  congruent genitalia, thereby eliminating the severe distress Ms. Quine experiences as a result of

8  having male genitalia but a female body and identity. Moreover, removal of the target organ

9  (testes) eliminates 80% of androgen production and involves an entirely different

10  pathophysiology than a medical suppressive regimen. (Kirk, 1999). Therefore, her entire

11  hormonal protocol would be minimized (low-dose estrogen is still required to maintain bone

12  density), conferring considerable health benefits, particularly therapeutic, given her history of

13  hepatitis C.

14       81.     Gender dysphoria intensifies with age. Ms. Quine currently denies suicidal

15  ideation as she is optimistic that she will receive surgery as a result of this lawsuit. Without

16  surgery, Ms. Quine will succumb to feelings of hopelessness and despair and will be at great risk

17  for emotional destabilization and suicide. This risk is particularly severe given her prior suicide

18  attempts.

19       82.     There are no contraindications to the implementation of medically necessary

20  surgical intervention for this inmate. The potential consequences of denying appropriate treatment

21  however, are predictable and dire.

22       I declare under penalty of perjury that the foregoing is true and correct.

23

24

25

26  Dated: July 23, 2015                          _Randi C Ettner PhD._
                                                   Randi C. Ettner, PhD
27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

19          DECLARATION OF DR. RANDI ETTNER

# ATTACHMENT B

1

2

3

4

5

6

7

8                          IN THE UNITED STATES DISTRICT COURT

9                          FOR THE NORTHERN DISTRICT OF CALIFORNIA

10                                  SAN FRANCISCO DIVISION

11

12

| | |
|---|---|
| **SHILOH HEAVENLY QUINE,** | C 14-02726 JST |
| Plaintiffs, | **DECLARATION OF RICHARD A. CARROLL, Ph.D.** |
| **v.** | Judge:        The Honorable Jon S. Tigar<br>Trial Date:   January 4, 2016<br>Action Filed: June 12, 2014 |
| **BEARD, et al.,** | |
| Defendants. | |

19        I, Richard A. Carroll, Ph.D., declare:

20        1.     I am an Associate Professor in the Department of Psychiatry and Behavioral Sciences

21  and Director of the Sexual Disorders & Couple Therapy Program at Northwestern University

22  Feinberg School of Medicine.  I am a reviewer for the Journal of Sex and Marital Therapy and the

23  Journal of Sexual Medicine.  I am a past President of the Society for Sex Therapy and Research.

24  I have published three articles related to gender dysphoria and have treated hundreds of patients

25  diagnosed with gender dysphoria over the past 30 years.  I received my Ph.D. in clinical

26  psychology from the University of Pittsburgh in 1985.

27

28

                                             1

2.     In June 2015, the California Department of Corrections and Rehabilitation (CDCR) retained me to render an opinion as to whether sex-reassignment surgery was medically necessary for CDCR inmate Shiloh Quine.

3.     In preparation for my assessment, I was provided with the definition of "medically necessary" procedures set forth in California Code of Regulations, title 15, section 3350.  Under that regulation, "medically necessary" is defined as health care services that are determined by the attending physician to be reasonable and necessary to protect life, prevent significant illness or disability, or alleviate severe pain, and are supported by health outcome data as being effective medical care.  "Severe pain" is defined as a degree of discomfort that significantly disables the patient from reasonable independent function.  And "significant illness" and "disability" are defined as any medical condition that causes or may cause if left untreated a severe limitation of function or ability to perform the daily activities of life or that may cause premature death.

4.     Before examining Ms. Quine, I reviewed all of her CDCR medical and mental-health records.

5.     On June 19, 2015, I personally interviewed Ms. Quine at Mule Creek State Prison for approximately three hours and performed various psychological tests during that time.  I found Ms. Quine to be cooperative, focused, and responsive to my questioning and testing.

6.     Ms. Quine's personal history and mental-health factors are consistent with a typical presentation of male-to-female gender dysphoria.  Ms. Quine has a long history of cross-dressing and persistent feelings of being a woman most of her life, including in her relationships with men. It is unsurprising that Ms. Quine kept her fantasies of being a woman hidden until 2009, given her dysfunctional childhood, feelings of shame and lack of exposure to the concept of gender dysphoria.  She meets the criteria for the diagnosis of Gender Dysphoria as defined by the Fifth Edition of the Diagnostic and Statistical Manual of the American Psychiatric Association.

7.     Ms. Quine also has a history of anxiety disorder and depressive disorder.  She has attempted suicide on multiple occasions and reports one instance of attempted self-castration. Ms. Quine's gender dysphoria is a separate diagnosis from her depressive disorder.  Ms. Quine suffers significant anxiety and depression as a direct result of her gender dysphoria.

2

8.      In 2009, CDCR psychologists diagnosed Ms. Quine with Gender Identity Disorder (now identified as Gender Dysphoria).  Since that time, Ms. Quine has been receiving feminizing hormone treatment and has been living as a woman.

9.      Based on my examination of Ms. Quine's medical and mental health records and my clinical interview, I have determined that genital sex-reassignment surgery is appropriate and medically necessary treatment for Ms. Quine.  Sex-reassignment surgery is medically necessary to prevent Ms. Quine from suffering significant illness or disability, and to alleviate severe pain caused by her gender dysphoria.  In addition, sex-reassignment surgery is likely to significantly reduce Ms. Quine's other mental-health conditions, which include depression, anxiety, and risk of suicide attempts.


I declare under penalty of perjury that the foregoing is true.  Executed August 6, 2015, in Chicago, Illinois.




RICHARD A. CARROLL, PH.D.

3