United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHILOH QUINE fka RODNEY JAMES QUINE,<br><br>Plaintiff,<br><br>v.<br><br>JEFFREY BEARD, et al.,<br><br>Defendants. | Case No.14-cv-02726-JST<br><br>**ORDER GRANTING IN PART AND DENYING IN PART MOTION TO ENFORCE**<br><br>Re: ECF No. 98 |

Before the Court is Plaintiff Shiloh Quine's motion to enforce the settlement agreement. ECF No. 98. The court will grant the motion in part and deny it in part.

## I. BACKGROUND

In 2014, Plaintiff Quine brought suit against the California Department of Corrections and Rehabilitation ("CDCR"), "seeking access to adequate medical care, including sex reassignment surgery," and certain structural changes in CDCR's treatment of transgender inmates. ECF No. 98-1 at 3. A year later, the parties reached an agreement to settle the case (the "Agreement"). The parties informed the court of the terms of the Agreement during a July 28, 2015 settlement conference.[1] The Agreement was formally lodged with the Court on August 7, 2017. ECF No. 49.

Under the Agreement, CDCR agreed to provide sex reassignment surgery to Plaintiff. See ECF No. 49. That surgery occurred and is not the subject of the instant motion. The Agreement also required CDCR to make the following structural changes:

---

[1] Magistrate Judge Nandor J. Vadas presided over the settlement negotiations and settlement conference.

> CDCR shall review and revise its policies to allow inmates identified by medical or CDCR personnel as transgender or having symptoms of gender dysphoria access to property items available to CDCR inmates consistent with those inmates' custody and classification factors, including property items that are designated as available to a specific gender only. Before those policies are final, Plaintiff shall have the opportunity to comment on its specific language, including provisions that limit certain property because of safety and security concerns. In addition, CDCR is reviewing and revising its policies concerning medically necessary treatment for gender dysphoria, including surgery.

Id. Part III.G. Plaintiff claims that CDCR has failed to comply with this provision of the Agreement.

The parties met and conferred about CDCR's property policy several times but could not reach an agreement. The parties then brought their dispute before Judge Vadas. The Agreement contemplates this process. It says:

> The Court shall retain jurisdiction of this litigation while this Agreement's terms are being executed. Any disputes between the parties concerning this Agreement shall first be presented to Magistrate Judge Nandor J. Vadas for informal dispute resolution without prejudice to a party's right to seek formal relief from the Court.

Id. Part III.H.[2] Judge Vadas held a telephonic hearing on May 25, 2016, and issued an order on June 9, 2017. ECF No. 74. Judge Vadas directed the parties to continue to meet and confer about the property policy and identified several necessary revisions. First, Judge Vadas ordered that "[t]he policy should be revised to allow 'inmates identified by medical or CDCR personnel as transgender or having symptoms of gender dysphoria' housed in male institutions at least some access to the following items currently only permitted in female institutions: Pajama/Nightgown, Robe, Sandals, Scarf, T-Shirts, and Walking Shoes." Id. at 2. Second, Judge Vadas found that the "[t]he policy should be revised to allow 'inmates identified by medical or CDCR personnel as transgender or having symptoms of gender dysphoria' housed in male institutions access to chains/necklaces in the same manner as inmates housed in female institutions." Id. Third, Judge Vadas concluded that "the policy should be revised to allow 'inmates identified by medical or

---

[2] This Court confirmed that Judge Vadas had authority to resolve disputes over enforcement of the Agreement on May 24, 2017, but did not address "whether CDCR's proposed changes to their inmate property policies comply with the terms of the settlement agreement." ECF No. 70.

CDCR personnel as transgender or having symptoms of gender dysphoria' housed in male institutions supervised access to the following items currently only permitted in female institutions: pumice stone, emery boards, and curling irons." Id. As for "bracelet, earrings, hair brush, and hair clips," Judge Vadas concluded that those items "pose significant safety and security concerns that may justify a policy that does not allow 'inmates identified by medical or CDCR personnel as transgender or having symptoms of gender dysphoria' housed in male institutions access to them." Id. Finally, Judge Vadas ordered the parties to "continue to meet and confer regarding inmates' access to binders, including whether binders should be provided to transgender male inmates as a state-issued clothing item or for purchase as a specialty item." Id. The parties continued to meet and confer about the property policy but still could not reach an agreement. Believing no further compromise was likely, Defendants elected to begin the regulatory rulemaking process to formalize the revised property policy. ECF No. 102 at 9.

This Court held a case management conference on January 4, 2017. When it learned that disputes remained related to the property policy, the Court set a deadline of March 1, 2017 for the filing of a motion for enforcement of the settlement agreement. ECF No. 93. This motion followed.

## II. LEGAL STANDARD

The Agreement provides that this Court retains jurisdiction over the enforcement of the Agreement. ECF No. 49 Part III.H. "The construction and enforcement of settlement agreements are governed by principles of local law which apply to interpretation of contracts generally." Jeff D. v. Andrus, 899 F.2d 753, 759 (9th Cir. 1989) (citing Air Line Stewards v. Trans World Airlines, 713 F.2d 319, 321 (7th Cir. 1983).

## III. ANALYSIS

Plaintiff identifies three ways in which CDCR has allegedly failed to comply with the Agreement. The Court addresses each in turn.

### A. Who Is Covered by the Property Policy

First, Plaintiff argues that CDCR breached the Agreement because the proposed property policy does not cover inmates who have "symptoms of gender dysphoria." ECF No. 98-1 at 7.

3

Instead, Plaintiff claims that "CDCR's revisions only apply to inmates 'who have been diagnosed as transgender[] as documented on the CDCR Form 1280C3' by medical." Id.

Plaintiff is correct that the Agreement clearly contemplates the property policy covering both "inmates identified by medical or CDCR personnel as transgender *or having symptoms of gender dysphoria*." ECF No. 49 Part III.G (emphasis added). But the document Plaintiff relies on for her argument is CDCR's regulation governing the referral and transfer of transgender inmates to specific institutions. ECF No. 100-4. The proposed property policy, by contrast, explicitly includes inmates with symptoms of gender dysphoria. Regarding clothing, the text of proposed regulations says: "Transgender inmates and inmates having symptoms of gender dysphoria as identified and documented in SOMS by medical or mental health personnel within a CDCR institution shall be allowed to possess the state-issued clothing that corresponds to their gender identities." ECF No. 104-1. Regarding personal property, the proposal explains that the "Transgender Inmates Authorized Personal Property Schedule (TIAPPS) (4/28/17) identifies a separate list of allowable personal property afforded to transgender inmates *and inmates with symptoms of gender dysphoria . . . .*" Id (emphasis added). In other words, CDCR's proposed property policies do cover inmates with symptoms of gender dysphoria, not just those who have been diagnosed as transgender. The fact that CDCR has a different (higher) standard for transferring an inmate than for granting that inmate access to certain personal property items does not violate the Agreement. In so finding, the Court agrees with Plaintiff that the Agreement does not allow CDCR to limit its proposed property policy only to those inmates residing at one of the designated "hub" institutions for inmates with a formal diagnosis. To the extent the policy as drafted does not provide for access in non-hub institutions, CDCR must revise the policy.

**B.      How Inmates Are Identified as Transgender**

Next, Plaintiff argues that CDCR breached the Agreement by "allowing only medical personnel to identify transgender inmates to gender-restricted items." ECF No. 98-1 at 7. According to Plaintiff, the "clear terms of the Agreement require that there be a process for non-medical CDCR personnel to allow access to gender-restricted items by identifying transgender inmates or inmates who may not be defined as transgender but who have symptoms of gender

4

dysphoria." Id.

The Agreement states that "CDCR shall review and revise its policies to allow inmates identified by *medical or CDCR personnel* as transgender or having symptoms of gender dysphoria access to property . . . ." ECF No. 49 Part III.G (emphasis added). Under the proposed regulations, "[t]ransgender inmates and inmates having symptoms of gender dysphoria as identified and documented in SOMS by medical or mental health personnel within a CDCR institution who are housed at male institutions may possess the authorized personal property . . . ." ECF No. 104-2. In other words, CDCR has limited the personnel who may classify inmates as eligible so that prison staff like a counselor, case manager, or corrections officer cannot make the final determination. Those staff could "inform medical staff of a patient's potential need for transgender assessment," but under CDCR's regulations, "this confidential medical determination should not be made by custody staff alone." ECF No. 102 at 12.

The Court is sympathetic to Plaintiff's argument that it is valuable to have "as broad a group of CDCR staff as possible" who "are able to sign off on an inmate's access to appropriate clothing and property items . . . ." ECF No. 98-1 at 7. Likewise, the Court acknowledges that limiting who may identify inmates as eligible for items from the revised property policy will sometimes result in a delay in inmates obtaining access. Nor does the Court dispute that Plaintiff and her counsel considered this point an important one during negotiations. ECF No. 101 at 2. But the Court does not see anything in the Agreement that would require that *all* CDCR staff, rather than mental health CDCR staff, have the power to make that determination. Of course, any CDCR staff member may still refer inmates to those with the authority to grant access. Just because custody staff are not the final step in signing off on an inmate's access to these property items, for example, does not mean they cannot begin the process.[3]

It is unclear from the briefing and supporting declarations whether CDCR mental health

---

[3] Moreover, the determination of whether an inmate is transgender or experiencing symptoms of gender dysphoria requires some level of professional expertise. While there might be some debate regarding what that level is, the present motion does not pose that question. It is sufficient for the Court to conclude that not all CDCR personnel are qualified to make that determination.

5

United States District Court
Northern District of California

1 staff can identify an inmate as transgender or having symptoms of gender dysphoria *without*
2 consultations with or some other involvement by outside medical staff.  Compare ECF No. 106
3 (describing role of medical and mental health providers) with ECF No. 109 at 3-5.  Because the
4 Agreement's language is written in the disjunctive ─ "inmates identified by medical *or* CDCR
5 personnel"─ the Court finds that CDCR's mental health staff alone must be able to classify an
6 inmate such that he or she is covered by the property policy.  Requiring CDCR's mental health
7 staff to obtain signoff by medical staff would constitute a breach of the Agreement.

### C. Items Included in the Property Policy

Finally, Plaintiff argues that "the exclusion of particular property items in the proposed policy violates the Equal Protection Clause and the Agreement." ECF No. 98-1 at 8.  CDCR responds that it has satisfied its obligations under the Agreement by allowing Plaintiff the opportunity to comment on its proposed property policy.  Disputes about specific items, CDCR says, are therefore not properly the subject of a motion to enforce.

The text of the Agreement does appear to limit Plaintiff's rights related to the proposed property policy.  Under the Agreement, CDCR must "review and revise its policies to allow inmates identified by medical or CDCR personnel as transgender or having symptoms of gender dysphoria access to property items available to CDCR inmates consistent with those inmates' custody and classification factors, including property items that are designated as available to a specific gender only."  ECF No. 49 Part III.G.  The Agreement also provides that "[b]efore those policies are final, Plaintiff shall have the opportunity to comment on its specific language, including provisions that limit certain property because of safety and security concerns."  Id.  As CDCR emphasizes, the agreement does not expressly contemplate that Plaintiff can dispute the policy on any particular property item so long as she was given the chance to comment on each item.

However, CDCR did represent in open court at the settlement conference that Plaintiff could dispute CDCR's policy on particular property items.  The following exchange occurred:

6

> Mr. Hoying: I have one clarification on point seven.[4] My understanding is that that will be a process in place for the parties to resolve any disputes with regard to items that are not being available based on safety and security concerns
>
> Mr. Russell: Yes, that's correct, Your Honor. I anticipated that that would be part of the Court's continuing jurisdiction of execution, that those will be reviewed by counsel and if there are any disputes, that they would be brought to you

ECF No. 103-1 at 7-8. In its opposition, counsel attempts to explain away this promise. Mr. Russell, the attorney for CDCR at the settlement conference, states that "[a]t the time of this exchange, I understood Plaintiff's counsel's question to mean that if Defendants failed to execute the subsequent written settlement agreement, including the agreement to discuss the proposed revisions to the property policy with Plaintiff, Plaintiff could enforce those provisions through the magistrate judge and this Court." ECF No. 103 ¶ 5. The Court does not find that interpretation persuasive. From the Court's perspective, the exchange makes clear that CDCR agreed to bring disputes about specific property "items that are not [made] being available" before the Court. Regardless of what Mr. Russell understood at the time, he clearly represented to the Court and to Plaintiff's counsel that Plaintiff could dispute the exclusion of particular property items from CDCR's policy and bring any unresolved disputes to the Court for resolution.

Moreover, the Agreement does require CDCR to "revise its policies to allow inmates identified by medical or CDCR personnel as transgender or having symptoms of gender dysphoria access to property items available to CDCR inmates consistent with those inmates' custody and classification factors." ECF No. 49 Part III.G. Plaintiff's challenge to the exclusion of specific items from the proposed policy is also reasonably viewed as an argument that CDCR failed to adequately "revise its policies." As a party to the case and the Agreement, Plaintiff clearly has the right to enforce that provision. Both due to defense counsel's representation to Judge Vadas and the plain language of the Agreement, the Court will consider Plaintiff's arguments related to specific property items.

Plaintiff complains about the exclusion of the following items from CDCR's proposed property policy: pajamas, nightgowns, robes, scarves, T-shirts, bracelets, earrings, hair brushes,

---

[4] This is the provision at issue in this motion.

and hair clips. ECF No. 98-1 at 8. Plaintiff also argues that "compression tops and binders should be available as state issued items, rather than for purchase by inmates. Id. at 9.

### 1. Standard of Review

The first question is under what standard the Court should review these challenges. Plaintiff claims that the denial of particular property items to transgender inmates constitutes gender discrimination subject to intermediate scrutiny. ECF No. 98-1 at 8. CDCR responds that Turner v. Safley sets forth the appropriate standard. 482 U.S. 78 (1987). Under Turner, "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." Id. at 89.

CDCR acknowledges, however, that the Supreme Court has exempted racial classifications in prison from the Turner test. See Johnson v. California, 543 U.S. 499, 510 (2005). For racial classifications, even in the context of prison, strict scrutiny is still the proper test. The Court contrasted racial classifications with classifications that infringe inmates due process rights and rights of association:

> The right not to be discriminated against based on one's race is not susceptible to the logic of Turner. It is not a right that need necessarily be compromised for the sake of proper prison administration.

Id.

Despite CDCR's argument to the contrary, the Court concludes that gender classifications, too, are exempt from the Turner test. At least one other district court in this circuit has reached the same conclusion.[5] In Greene v. Tilton, a prisoner argued that CDCR violated the Equal Protection Clause by "imposing disparate property requirements for male and female inmates." No. 2:09-CV-0793 JAM JFM, 2012 WL 691704, at *3 (E.D. Cal. Mar. 2, 2012), report and recommendation adopted, 2012 WL 1130602 (E.D. Cal. Mar. 29, 2012). As in this case, the parties disputed the standard for evaluating the challenged classifications. The court noted the existence of a circuit split on the question of whether, post-Johnson, gender discrimination claims

---

[5] Other courts have applied intermediate scrutiny to gender classifications in prisons without addressing Turner directly. See, e.g., Leinweber v. Tilton, No. 1:09-cv-00793, 2010 WL 3521869, at *3 (E.D. Cal. Sept. 8, 2010).

8

are evaluated under the Turner test. Then, as now, the Ninth Circuit had yet to decide the issue. The Greene court concluded that, "[i]n the absence of controlling caselaw, . . . the right to be free of gender discrimination is a 'right that need [not] necessarily be compromised for the sake of proper prison administration.'" Id. at *7-8 (quoting Johnson, 543 U.S. at 510). In other words, the court concluded that both gender and racial classifications should face a heightened level of scrutiny, rather than Turner's more deferential test. Quoting a D.C. Circuit opinion that likewise rejected the Turner test for gender classifications, Greene provided "[a]n elaboration of the[] dangers of gender discrimination [that] emphasizes the need for heightened scrutiny":

> A classification relying explicitly upon gender peculiarly suggests that the state is pursuing an improper purpose, one that furthers or contains fixed notions concerning the roles and abilities of males and females, for example, embodying an objective to exclude or 'protect' members of one gender because they are presumed to suffer from an inherent handicap or to be innately inferior. The facial classification especially raises the danger that the state has chosen means that are not substantially related to a legitimate state interest. The statute may not employ gender as an inaccurate proxy for other, more germane bases of classification. Nor may what the Supreme Court has condemned as increasingly outdated misconceptions concerning the role of females in the home rather than in the 'marketplace and world of ideas underlie the classification based upon gender. A state classification that directs prisoners to distant locations if they are female and locates them nearby if they are male directly implicates these concerns; that sort of classification, the Supreme Court has commanded, demands the court's special attention to ensure that the dangers posed are not dangers in fact.

Id. (quoting Pitts v. Thornburgh, 866 F.2d 1450, 1454–55 (D.C. Cir. 1989) (internal citations and quotation marks omitted). CDCR has offered no reason to set aside these dangers and apply Turner's rational relationship test to the proposed property policy. The Court will therefore subject CDCR's decision on each property item to intermediate scrutiny. The application of intermediate scrutiny requires the government to show that its gender classification is substantially related to an important governmental interest, "requiring an exceedingly persuasive justification." Coal. for Econ. Equity v. Wilson, 122 F.3d 692, 702 (9th Cir.1997) (quoting City of Cleburne, Tex. v. Cleburne Living Ctr., 473 U.S. 432, 441 (1985)).

### 2. Clothing: pajamas, nightgowns, robes, scarves, T-shirts

The clothing items that Plaintiff argues should be included in the property policy are:

9

pajamas, nightgowns, robes, scarves, and t-shirts. Plaintiff first raised this dispute before Judge Vadas, who concluded that "[t]he policy should be revised to allow 'inmates identified by medical or CDCR personnel as transgender or having symptoms of gender dysphoria' housed in male institutions at least some access to the following items currently only permitted in female institutions: Pajama/Nightgown, Robe, Sandals, Scarf, T-Shirts, and Walking Shoes." ECF No. 74 at 2.[6]

CDCR's draft policy allows transgender female inmates in male institutions to have sandals, t-shirts, and walking shoes, but not the other items listed above. ECF No. 104-2. CDCR says it cannot introduce the other clothing items into male institutions "because male inmates are more escape-prone than female inmates." ECF No. 104 ¶ 14. CDCR goes on to explain that these items "contain large amounts of cloth that is significantly different from the cloth used in prison-issued clothing, which can be altered by inmates to approximate the look of street clothing, thus aiding in escape attempts." Id. But as Plaintiff notes, inmates at male institutions can purchase a number of other "street clothing" items—athletic shorts, sweat pants, a poncho, etc.—that would seem to create the same risk, if not a greater one. ECF No. 109 at 9. The Court concludes that CDCR has not provided an "exceedingly persuasive justification," Coal. for Econ. Equity, 122 F.3d at 702, for its exclusion of these clothing items. CDCR is ordered to revise its policies to allow for access to pajamas, nightgowns, robes, scarves consistent with inmates' custody and classification factors, in addition to the sandals, t-shirts, and walking shoes already permitted by the policy.

### 3. Non-Clothing Property: bracelets, earrings, hair brushes, and hair clips.

Plaintiff also challenges the exclusion of "bracelets, earrings, hair brushes, and hair clips" from the proposed property policy." ECF No. 98-1 at 10. Defendant does not directly address these specific items in its opposition brief, but states generally that "[m]any items contain metal parts or hard plastic that can be easily broken down to make weapons or weapons tools." ECF No. 102 at 12. CDCR also argues it needs to limit jewelry in male institutions to "minimize disruptive

---

[6] Although the Court finds Judge Vadas's rulings on these items helpful, it reviews each challenge de novo.

10

and predatory behavior between inmates where relatively weaker inmates are pressured into giving away items of personal property" and to prevent the use of "high value items [as] a form of currency, which it asserts can "lead to gambling, gambling debts, and even violence." ECF No. 104 ¶ 13. Judge Vadas appears to have agreed with the weapons-related argument, finding that "bracelet[s], earrings, hair brush, and hair clips" "pose significant safety and security concerns that may justify a policy that does not allow 'inmates identified by medical or CDCR personnel as transgender or having symptoms of gender dysphoria' housed in male institutions access to them." ECF No. 74 at 2.

The Court does not find CDCR's weapons-related justification persuasive. As Plaintiff notes, because these items are permitted in women's institutions, there is evidence that they "can be made of materials and in colors that are safe for prison settings." ECF No. 109 at 8. Hair brushes, for example can be made of rubber instead of metal or hard plastic. CDCR offers no reason why the risk from these items cannot be sufficiently reduced in male prisons, as it has been in women's prisons. Indeed, CDCR's agreement to allow plastic tweezers while prohibiting metal ones exemplifies how potentially dangerous items can be made safe enough to allow in prison. ECF No. 105 ¶ 3.

The Court likewise finds unconvincing CDCR's arguments for prohibiting bracelets. Bracelets are permitted in women's institutions, and CDCR does not explain why the risk of predatory behavior by certain inmates or use of high value items as currency would not exist there as well. Absent such an explanation, the Court cannot conclude that CDCR has provided an "exceedingly persuasive justification" for its prohibition on bracelets in men's prison.

The orders CDCR to revise its policies to allow for access to bracelets, earrings, hair brushes, and hair clips, albeit modified versions of those items as necessary to accommodate CDCR's safety concerns.

### 4. Compression Tops and Binders

The final dispute relates to compression tops and binders. "The proposed policy allows transgender male inmates housed at female institutions to purchase and wear compression tops or binders (an undergarment that flattens the chest) instead of a bra, which female inmates are required to wear." ECF No. 102 at 7. Plaintiff argues that these items should be available as state

11

issued items, rather than for purchase by inmates. ECF No. 98-1 at 9. Defendant gives the following justification: "All state-issued clothing is made by the Prison Industry Authority (PIA), and the PIA has indicated to CDCR that it will not manufacture these items because they are used by so few inmates." ECF No. 104 ¶ 15. It seems to the Court that if CDCR has approved certain binders and compression tops for sale, it can provide those items for free even if they are not manufactured by the PIA. To make the items available only for purchase is effectively to deny them to those inmates who cannot afford them. In the absence of any other justification for this decision, the Court orders CDCR to include binders and compression tops in the items it provides to transgender male inmates or inmates with symptoms of gender dysphoria housed at female institutions.

## CONCLUSION

The Court grants the motion to enforce in part and denies it in part.

IT IS SO ORDERED.

Dated: April 28, 2017

_____
JON S. TIGAR
United States District Judge

12