FILED

JUN 29 2018

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

*Quine v. Kernan*, Nos. 17-16148, 17-16212
Paez, J., concurring in part and dissenting in part.

I agree with the majority that Quine lacks standing to bring an equal protection claim and that the record does not provide sufficient information to determine whether CDCR is in compliance with the settlement agreement's access requirement for inmates detained in non-hub facilities. I also agree with the majority that the district court did not err when it determined that, pursuant to the terms of the settlement agreement, only medical professionals and CDCR mental health staff may identify transgender inmates or inmates experiencing symptoms of gender dysphoria. Nonetheless, I dissent in part because I part ways with the majority on two issues: first, whether the settlement agreement grants Quine the right to challenge individual exclusions from the property list; and second, whether the district court abused its discretion when it ordered CDCR to provide male transgender inmates compression tops.

As we have repeatedly recognized, California's parol evidence rule is unusually generous. It "permit[s] the introduction of extrinsic evidence to demonstrate the existence of an ambiguity even when the language of a contract is perfectly clear." *Wilson Arlington Co. v. Prudential Ins. Co. of Am.*, 912 F.2d 366, 370 (9th Cir. 1990). Extrinsic evidence is therefore permissible when offered to show the meaning of a contested contractual term, so long as the term itself is

"reasonably susceptible" to the meaning advanced by the party introducing the extrinsic evidence. *Pac. Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co.*, 69 Cal. 2d 33, 37 (1968) (internal quotation marks and citation omitted). In short, extrinsic evidence is admissible to expose a latent ambiguity "even if a contract appears unambiguous on its face." *Dore v. Arnold Worldwide, Inc.*, 39 Cal. 4th 384, 391 (2006) (internal quotation marks omitted).

The majority mistakenly conflates patent and latent ambiguity, even though the California Supreme Court has explicitly distinguished between the two. *See id.* at 393 (concluding that no triable issues of fact existed because the letter at issue "contained no ambiguity, patent *or* latent, in its termination provisions" (emphasis added)); *see also Alameda Cty. Flood Cent. v. Dep't of Water Res.*, 213 Cal. App. 4th 1163, 1180 (2013) ("'An ambiguity can be patent, arising from the face of the writing, or latent, based on extrinsic evidence.'" (quoting *Solis v. Kirkwood Resort Co.*, 94 Cal. App. 4th 354, 360–61 (2001))). The term "opportunity to comment" may appear unambiguous on its face, but the extrinsic evidence here reveals a latent ambiguity that the language of the settlement agreement is reasonably susceptible to.

As the district court recognized, counsel for Quine expressly asked CDCR at the settlement conference whether this specific provision granting Quine an

Page 2 of 6

opportunity to comment on CDCR's property policy also included a "process in place for the parties to resolve any disputes with regard to items that are not being available based on safety and security concerns." Counsel for CDCR responded affirmatively and further represented to the court that if there were any disputes about the property policy, they would be brought before the court as part of the court's "continuing jurisdiction of execution." The parties therefore agreed and confirmed that the "opportunity to comment" provision of the settlement agreement included the opportunity for Quine to *dispute* the exclusion of certain items from the property policy prior to its finalization. This introduces latent ambiguity into the meaning of "opportunity to comment."

    The structure of the settlement agreement lends further support for Quine's understanding of the "opportunity to comment" provision. The next provision of the agreement states that the district court "shall retain jurisdiction of this litigation while this Agreement's terms are being executed. Any disputes between the parties concerning this Agreement shall first be presented to Magistrate Judge Nandor J. Vadas . . . without prejudice to a party's right to seek formal relief from the Court." Read together—and in the context of CDCR counsel's representation at the settlement hearing—the agreement clearly contemplates that Quine can dispute the property policy in court. Critically, "opportunity to comment" is not so

Page 3 of 6

rigid a term as to preclude Quine from "reasonably under[standing]," *Dore*, 39 Cal. 4th at 393, the term to include an opportunity to dispute.

Furthermore, "[b]ecause a trial court's review of extrinsic evidence is essentially an inquiry into the intent of the contracting parties, its conclusions based on such evidence must be accorded great weight." *In re U.S. Fin. Sec. Litig.*, 729 F.2d 628, 632 (9th Cir. 1984). When, as here, "the inquiry extends beyond the words of the contract and focuses on related facts . . . , the trial court's consideration of extrinsic evidence is entitled to great deference and its interpretation of the contract will not be reversed unless it is clearly erroneous." *Id.* The district court here made a finding of fact that the parties agreed at the settlement conference to include an opportunity to dispute the property policy in the settlement agreement's "opportunity to comment" provision. This finding, in turn, guided the district court's interpretation of the agreement. Because the district court's factual finding was not clearly erroneous, I would affirm the district court's well-reasoned conclusion that the agreement grants Quine the right to dispute the exclusion of items from the property policy.[1] *Cf. Mendler v.*

---

[1] I nonetheless join the majority opinion in concluding that Quine lacks standing to assert an equal protection claim, whether independently or arising from the "opportunity to comment" provision of the settlement agreement, because parties cannot contract for standing. *See D'Lil v. Best Western Encina Lodge &*
(continued...)

*Winterland Prod., Ltd.*, 207 F.3d 1119, 1121 (9th Cir. 2000) ("While we are wont to defer when a district court relies on extrinsic evidence in interpreting an ambiguous contract, the district court here made no findings of fact with regard to the copyright claim.").

Nor did the district court abuse its discretion when it ordered CDCR to provide compression tops to male transgender inmates. The settlement agreement mandates that CDCR must revise its policies to guarantee Identified Inmates "access to property items." This access, however, must be *equivalent*. CDCR would hardly comply with the terms of the agreement if it charged transgender inmates—but not their cisgender counterparts—a surcharge for items like makeup or aftershave. Accordingly, CDCR's revised policy provides that transgender inmates "shall be allowed to possess the *state-issued* clothing that corresponds to their gender identities in place of the state-issued clothing that corresponds to their assigned sex at birth at designated institutions." Cal. Code Regs. tit. 15 § 3030(c) (emphasis added).

---

[1](...continued)
*Suites*, 538 F.3d 1031, 1036 (9th Cir. 2008) ("As the Supreme Court has explained, 'the question of standing is not subject to waiver.'" (quoting *United States v. Hays*, 515 U.S. 737, 742 (1995)). In my view, the settlement agreement preserved Quine's ability to bring claims pertaining to the property policy, but it did not contemplate claims for which she lacked standing.

The majority reads the list of state-issued property too literally. A quick examination of state-issued clothing reveals that CDCR provides detained men and women equivalent items. Men receive three pairs of jeans and blue chambray shirts. *See id.* § 3030(b)(2). Women receive three pairs of slacks and blouses/t-shirts. *See id.* § 3030(b)(3). Men receive undershorts; women receive panties. *See id.* § 3030(b). Cisgender female inmates receive bras. The equivalent of bras for transgender male inmates are compression tops. Because the state already issues bras to female inmates (and requires them to wear them), equivalent access to state-issued property from the property list for transgender male inmates in female institutions reasonably means that compression tops must be state-issued as well. I would therefore affirm the district court's ruling on this issue.

In my view, the majority's narrow reading of the settlement agreement not only fails to accord the district court's order due deference, it denies Quine the full value of what she negotiated for.

For the foregoing reasons, I respectfully dissent in part from the majority's disposition.